**UNITED STATES of America,**
**Plaintiff,**

v.

**CHEVRON PIPE LINE COMPANY,**
**Defendant.**

**Civil Action No. 5:05–CV–293–C ECF.**

United States District Court,
N.D. Texas,
Lubbock Division.

June 28, 2006.

Scott E. Stewart, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, E. Scott Frost, U.S. Attorney's Office, Lubbock, TX, for Plaintiff.

Richard P. Hogan, Jr., Pillsbury Winthrop Shaw Pittman, Houston, TX, for Defendant.

## *ORDER*

CUMMINGS, District Judge.

On this date, the Court considered the Motion for Summary Judgment, filed March 21, 2006, by Defendant, Chevron Pipe Line Company ("Chevron"). Plaintiff, the United States of America, filed its Response in Opposition on April 10, 2006. The Court further considered the parties' Briefs and Appendixes in support of their arguments.

## I.

### PROCEDURAL HISTORY

The United States filed its Complaint on December 30, 2005. Chevron filed its Answer on February 23, 2006. On March 9, 2006, the United States filed a Motion to Stay Proceedings Pending United States Supreme Court Ruling in *Rapanos* and *Carabell*. Chevron filed its Response to the Motion to Stay on March 21, 2006. Chevron also filed the pending Motion for Summary Judgment on March 21, 2006. On April 7, 2006, the Court ruled on the United States' Motion to Stay by denying said Motion.[1] The United States then filed its Response to the pending Motion for Summary Judgment on April 10, 2006. On May 16, 2006, Chevron filed a Notice of Traditional Filing of Appendix 1.B (USGS Map) to Brief in Support of Motion for Summary Judgment.

1. However, prior to this Court's issuance of this Order, the United States Supreme Court has issued its opinion for those two consolidated appeals.

## II.

### FACTUAL BACKGROUND

Chevron operated a six-inch crude oil gathering pipeline in the Kelly–Snyder oil field (near Snyder, Texas). Sometime on or before August 24, 2000, the pipeline failed from alleged external corrosion. Crude oil was discharged from the pipeline. Chevron admits that approximately 3000 barrels of crude oil were discharged in this spill (approximately 126,000 gallons). The oil migrated into a unnamed channel/tributary where it ponded and stained the soil for a distance of approximately 100 feet up gradient and approximately 500 feet down gradient from the spill site.

On August 24, 2000, Chevron began its remedial response. Chevron performed substantial cleanup work in the areas of spill including soil excavation, groundwater remediation, and other activities. Chevron removed oil on the surface which had ponded and soil was excavated where the oil had percolated into the ground. The response included efforts in the initial unnamed channel/tributary into which the oil had run, as well as in the bed of Ennis Creek where some of the subsurface oil

had migrated. By early October 2000, Chevron had removed the crude oil-stained and -saturated bank of the unnamed channel/tributary in the area near the pipeline rupture using a series of excavations done by Chevron contractors.

Chevron contends that the beds of the unnamed channel/tributary and of Ennis Creek contained no flowing surface water during August, September, and early October 2000. The United States appears to allege that there might have been some pooled water present in either the unnamed channel/tributary or Ennis Creek at its confluence with the unnamed channel/tributary on August 25, 2000.[2] The parties do not dispute that no measurable rainfall occurred during August or September 2000 and the first measurable rainfall admitted to by Chevron occurred on October 12, 2000. The unnamed channel/tributary into which the oil spilled is an "intermittent" stream—usually dry in the absence of a significant rainfall event.[3] Likewise, Ennis Creek, also characterized as intermittent by the United States Geological Survey ("USGS") topographical map, only flows surface water during or shortly after a significant rainfall event. The unnamed channel/tributary joins En-

2. Chevron contends that even if such a contention is supported by evidence, the presence of pooled water is irrelevant under the case law. Rather, Chevron argues that even if pooled water may have been touched by oil, it is undisputed that the water was not navigable—the relevant issue for this summary judgment. (Def.Br.8–9.) Additionally, the United States also argues that "... the Presence or Absence of Water at the Time of the Spill Is Immaterial." (Pl. Br. 28 (title of section of argument from pp. 28–31)).

3. Although the United States did not use the term "significant," its own Complaint alleges that the unnamed channel/tributary and Ennis Creek "are intermittent streams" that flow "during and after rainfall events." (Pl. Orig.Compl.5, ¶ 23.) The Court only uses the term "significant" to clarify that not every

minor rainfall event would be likely to create a flow. Chevron's Appendix contains the affidavit of Vernon Duncan, which states that "[d]uring and after some rainfall events, rainwater can flow through the normally dry channel and into Ennis Creek, with the intensity of the flow being a function of the magnitude of the rainfall event." (Def.App.6.¶ 17.)

Moreover, in arguing that intermittent streams should be covered, the United States contends that "[t]he fact that the unnamed creek and Ennis Creek are intermittent streams that were not flowing at the time and location of the spill does not mean that discharges into these streams are exempt from the CWA." (Pl.Br.2–3.) Thus, the United States seems to admit that neither the unnamed channel/tributary nor Ennis Creek contained flowing water at the time and location of the spill.

nis Creek approximately 500 feet from the location of the spill. Ennis Creek then extends 17.5 river miles to its confluence with Rough Creek. The USGS topographical and hydrological maps also depict Rough Creek as "intermittent," meaning that it generally only flows after receiving water from rainfall runoff. Rough Creek extends 23.8 river miles to its confluence with the Double Mountain Fork of the Brazos River.[4] The Double Mountain Fork of the Brazos is alleged to flow approximately 82.2 river miles to its confluence with the Brazos River. The United States asserts that "[d]uring times of flow, there is an unbroken surface water tributary connection from the unnamed tributary creek [channel] at the site of the [Chevron pipeline] spill through Ennis Creek, Rough Creek, to the Double Mountain Fork of the Brazos River and into the Brazos River." (Pl.Br.11) (emphasis added).

Chevron alleges that "there was no flow in either the channel or Ennis Creek between the time of the spill and the conclusion of remediation efforts" and that "[a]t no time did oil from the spill contact any water flowing in either the dry channel or Ennis Creek." (Def.Br.4, 10.) However, the United States argues that reports written by Chevron's contractor document two extensive areas of oil-contaminated soil which still remained after October 12, 2000 (the date of rainfall in the area and the first date Chevron admits there was flow

in the channel). The United States also contends that Texas Railroad Commission Field Inspection Reports dated in November and December of 2000 state that there was "[s]till oily soil present in the draw ... [and a] good deal of work left to be done," (Pl.App.61), and that Chevron was not in compliance with regard to oil spill clean-up and water protection at the site. (Id. at 62.)

Chevron did not request certification from the Texas Railroad Commission that no further cleanup work was required until May 17, 2005. The Railroad Commission responded that additional samples from the area were required to verify that cleanup was complete. The United States argues that as of the date its Response was filed, the Railroad Commission has not yet certified that the cleanup is complete.

It appears that this lawsuit was not filed in an effort to force Chevron to remediate the spill—as it is clear that Chevron has already begun, if not completed, that task. Rather, it appears that the United States has sought to impose civil fines upon Chevron arising from the spill. Chevron argues that fines cannot be imposed because jurisdiction under the relevant provisions allowing said fines is lacking absent "navigable waters."

## III.

### STANDARD[5]

Summary judgment is appropri-

---

**4.** It is not clear to the Court whether Chevron concedes that the Double Mountain Fork of the Brazos might be a navigable waterway. The United States argues that Chevron "does not make an explicit admission" of such. (Pl. Br.11.)

**5.** In general, where subject matter jurisdiction is being challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. See Land v. Dollar, 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91

L.Ed. 1209 (1947). "However, where issues of fact are central both to subject matter jurisdiction and the claim on the merits, the trial court must assume jurisdiction and proceed to the merits." Montez v. Dep't of Navy, 392 F.3d 147, 150 (5th Cir.2004). "In circumstances where 'the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court ... is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case' under either

ate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. 2505. An actual controversy of fact exists only where both parties have submitted evidence of contradictory facts. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir.1999). The contradictory facts must be relevant, because disputed fact issues which are irrelevant and unnecessary will not be considered by the court when ruling on a summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must draw all *justifiable* inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505 (emphasis added).

Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the non-movant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED.R.CIV.P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990). Conclusory allegations and denials, speculation, improbable . inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for

Rule 12(b)(6) or Rule 56." *Id.* (citing *Williamson v. Tucker*, 645 F.2d 404, 415 (5th

specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428 (5th Cir.1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993).

To defeat a properly supported motion for summary judgment, the non-movant must present more than a mere scintilla of evidence. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. Rather, the non-movant must present sufficient evidence upon which a jury could reasonably find in the non-movant's favor. *Id.* Absent such a showing, a properly supported motion for summary judgment should be granted. *See Eversley v. MBank Dallas*, 843 F.2d 172, 173–74 (5th Cir.1988); *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1022–23 (5th Cir.1995). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

If no factual showing is made in opposition to a motion for summary judgment, the district court is not required to search the record *sua sponte* for some genuine issue of material fact. In reviewing the summary judgment evidence, "Rule 56 does not impose upon this Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Rather, the Court need rely only on those portions of the submitted documents to which the nonmoving party directs the Court's attention. *Id.; see also Forsyth v. Barr*, 19 F.3d 1527, 1536–37 (5th Cir.1994) (finding that two volumes of summary judgment evidence were insuffi-

Cir.1981)).

**610**

cient to preclude summary judgment when plaintiffs failed to identify specific portions which supported their claims). This is because Rule 56(e) of the Federal Rules of Civil Procedure requires the party against whom the motion is made to "set forth specific facts showing that there is a genuine issue for trial," and absent such a showing, a properly supported motion for summary judgment should be granted. *See Eversley v. MBank Dallas,* 843 F.2d 172, 173–74 (5th Cir.1988); *Resolution Trust Corp. v. Starkey,* 41 F.3d 1018, 1022–23 (5th Cir.1995).

Finally, "[a] party whose motion or response is accompanied by an appendix must include in its brief citations to each page of the appendix that supports each assertion that the party makes concerning the summary judgment evidence." LR 56.5(c). In other words, factual assertions must be supported by citations to proper and admissible summary judgment evidence that support such an assertion.

## IV.

## DISCUSSION

Chevron argues that under the facts of this summary judgment record, it is not responsible for the discharge of oil into or upon "navigable waters" or adjoining shorelines within the meaning of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.* (West 2001), as amended by the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 *et seq.* (West 2001).[6] The heart of this argument lies in Chevron's statement that "it seems self-evident that the Clean Water Act does not apply in the absence of water." (Def.Br.7.) Chevron further argues that, in any event, even if a fact issue exists as to the presence of surface water at the spill site, no "navigable waters" were involved. Chevron next argues that the discharged oil did not impact water in "harmful quantities" upon any navigable water. 40 C.F.R. § 110.3 (2006).[7] Finally, Chevron contends that this Court should interpret the statutes at issue so as not to implicate a constitutional challenge involving Congress's power under the Commerce Clause—and that to interpret them in the manner urged by the United States would implicate a constitutional challenge.

The United States counters that Chevron's motion is premised on an erroneous reading of the term "navigable waters" under the CWA and that the CWA governs the geographic reach of critical programs designed to prevent and eliminate the pollution of the Nation's waters.

Specifically, the United States argues that Chevron is attempting to limit the term "navigable waters" to waters that fall within the traditional meaning of navigable—that is, waters that are "navigable-in-fact."[8] The United States argues that

---

**6.** The OPA imposes strict liability for a discharge of oil into or upon "navigable waters," a term defined to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 2701(21) (West 2001). "[E]ach responsible party for a vessel or facility from which oil is discharged ... into or upon the navigable waters or adjoining shorelines ... is liable for the removal costs and damages ... that result from such incident." *Id.* at § 2702(a) (West Supp.2006).

**7.** The discharge of oil must occur in harmful quantities. 33 U.S.C. § 1321(b)(3) (West 2001); 40 C.F.R. § 110.3 (2006).

**8.** The parties do not dispute that the realities of the often-arid west Texas landscape and climate prevent any navigable-in-fact uses of the unnamed channel/tributary, Ennis Creek, or Rough Creek (and likely the Double Mountain Fork of the Brazos) for any commercial use or susceptibility of such use beyond that which could best be described as sporadic and generally ineffective. Sporadic and generally ineffective commercial use of a stream has been held to prevent a stream's classification as a navigable (in fact) water. *United States v. Oregon,* 295 U.S. 1, 23, 55 S.Ct. 610, 79 L.Ed. 1267 (1935) (waterway is not navigable where commercial use or susceptibility of use is "sporadic and ineffective").

under the CWA and the OPA, Congress intended the term "navigable waters" to include a farther-reaching definition so as to encompass tributaries (whether intermittent or permanently flowing) that feed a traditionally navigable stream and thus effectuate the goal of the CWA.[9] Thus, the United States appears to argue that the broad intent of the relevant statutes should control rather than the literal language of the statutes. (Pl. Br. 3 ("Such a result would be inconsistent with EPA's reasonably promulgated regulations and would undermine Congress' goal of restoring and maintaining the chemical, physical and biological integrity of the nation's waters.")). The United States contends that the summary judgment evidence shows that oil reached the adjoining shoreline of the unnamed channel/tributary—thereby meeting the requirements to show a harmful quantity was discharged (or at least that a genuine issue of material fact exists as to whether this occurred). In making this contention, the United States assumes that the unnamed channel/tributary is itself jurisdictionally covered under the CWA and OPA and thus the harmful quantity requirement was met.

Finally, the United States asserts that, interpreting the statutes as it urges, no constitutional challenge exists and any prior precedence in this circuit requiring a different conclusion is mere "dicta."

The United States would characterize the reasoning of the Fifth Circuit Court of Appeals in *In re Needham*, regarding the meaning of "navigable waters" under the CWA, as mere dicta. 354 F.3d 340 (5th

Cir.2003) (finding in favor of the United States that oil spilled into navigable waters or waters adjacent to a navigable water while discussing that the United States' definition of navigable waters was unsustainable in certain circumstances) (E.Jones, J.). However, the fact is, *Needham* is the closest case on point in this circuit and this Court will look to the discussion and reasoning contained in that opinion—dicta or not.[10] The *Needham* court specifically discussed the relevance of the waterway being navigable in fact or adjacent to a navigable body of water. *See id.* at 344–47. "Consequently, in this circuit the United States may not simply impose regulations over puddles, sewers, roadside ditches and the like; under SWANCC 'a body of water is subject to regulation ... if the body of water is actually navigable or adjacent to an open body of navigable water.'" *Id.* at 345–46 (quoting *Rice v. Harken Exploration Co.*, 250 F.3d 264, 269 (5th Cir.2001)). In a footnote citing an earlier opinion, the Fifth Circuit stated, "[i]n the end, there must be 'a close, direct and proximate link between ... [the] ... discharges of oil and any resulting actual, identifiable oil contamination of natural surface water that satisfies the jurisdictional requirements of the OPA.'" *In re Needham*, 354 F.3d at 346 n. 9 (quoting *Rice v. Harken Exploration Co.*, 250 F.3d at 272) (second brackets in original).

As is the case here, the United States in *Needham* urged approval of its regulatory definition of "navigable waters." *Id.* at 345 (citing 40 C.F.R. § 300.5 (2003)). Said

---

9. The United States argues that the regulatory definitions promulgated under the CWA cover tributaries whether the tributary is in fact navigable or not. (Pl.Br.19–28.)

10. This Court notes that Justice Stevens, dissenting in *Rapanos*, acknowledges that *Needham* held "waters of the United States" to be read narrowly as used in the Oil Pollution

Act. *Rapanos v. United States*, 547 U.S. ——, 126 S.Ct. 2208, 2221 n. 5, 165 L.Ed.2d 159 (2006) (Stevens, J., dissenting). Thus, even the dissenting opinion in *Rapanos* did not classify the Fifth Circuit's reasoning as "mere dicta," but instead recognized this circuit's limitation on the United States' unfettered definition.

regulatory definition "includes as 'navigable waters' all 'tributaries' of navigable-in-fact waters." *Id.* As in the case at hand, the United States in *Needham* argued that this "definition covers all waters, excluding groundwater, that have any hydrological connection with 'navigable water.'" *Id.* The Fifth Circuit soundly rejected the regulatory definition if it would "impose regulations over puddles, sewers, roadside ditches and the like." *Id.* The *Needham* panel stated that the regulatory definition urged by the United States "is unsustainable under [prior United States Supreme Court precedent]." *Id.*[11] Judge Jones, in writing the opinion, went on to state that "[t]he CWA and the OPA are not so broad as to permit the federal government to impose regulations over 'tributaries' that are neither themselves navigable nor truly adjacent to navigable waters." *Id.* In determining whether the spill affected "navigable waters," the *Needham* panel reasoned, "the proper inquiry is whether . . . the site of the farthest traverse of the spill, is *navigable-in-fact* or adjacent to an open body of navigable water." *Id.* at 346 (citing *Rice v. Harken Exploration Co.*, 250 F.3d 264, 269 (5th Cir.2001) (emphasis added)).

The United States Supreme Court has now also addressed, albeit without a consensus, the issues raised in this case. In a plurality opinion, the United States Supreme Court has stated that intermittent and ephemeral streams—streams whose flow is coming and going at intervals—are not covered. *See Rapanos v. United States*, 547 U.S. ——, 126 S.Ct. 2208, 2220–2224, 165 L.Ed.2d 159 (2006) (plurality opinion) (Scalia, J.).

On this definition, "the waters of the United States" include only relatively permanent, standing or flowing bodies of water. The definition refers to water as found in "streams," "oceans," "rivers," "lakes," and "bodies" of water "forming geographical features." *Ibid.* All of these terms connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows.

*Id.* at 2220–2221 (quoting Webster's New International Dictionary 2882 (2d ed.1954)) (footnotes omitted).

In looking at defining intermittent tributaries as "point sources" rather than "waters of the United States," Justice Scalia states that "[t]he separate classification of 'ditch[es], channel[s], and conduit[s]'—which are terms ordinarily used to describe the watercourses through which *intermittent* waters typically flow—shows" that these are, by and large, *not* "waters of the United States." *Id.* at 2223–2224 (emphasis and brackets in original).

In sum, on its only plausible interpretation, the phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams[,] . . . oceans, rivers, [and] lakes." The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall. The Corps' expansive interpretation of "the waters of the United States" is thus not "based on a permissible construction of the statute."

---

**11.** The Fifth Circuit's reading of *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers* ("SWANCC"), 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), is supported by the discussion of SWANCC as limiting the unbridled jurisdictional reaches of the CWA urged by the United States. *See Rapanos v. United States*, 547 U.S. ——, 126 S.Ct. 2208, 2235, 165 L.Ed.2d 159 (2006) (Roberts, C.J., concurring).

*Id.* at 2224–2225 (citations omitted). Thus, the plurality looked to the statutory wording of the CWA and gave it its plain and literal meaning—a constructionist viewpoint.

Yet, the Supreme Court failed to reach a consensus of a majority as to the jurisdictional boundary of the CWA. As Chief Justice Roberts wrote, "[i]t is unfortunate that no opinion commands a majority of the Court on precisely how to read Congress' limits on the reach of the Clean Water Act. Lower courts and regulated entities will now have to feel their way on a case-by-case basis." *Id.* at 2236 (Roberts, C.J., concurring). Justice Kennedy wrote his own concurring opinion and advanced an ambiguous test—whether a "significant nexus" exists to waters that are/were/might be navigable. *Id.* at 2236–52 (Kennedy, J., concurring in judgment and writing separately on determining what falls within the jurisdiction of the CWA). This test leaves no guidance on how to implement its vague, subjective centerpiece. That is, exactly what is "significant" and how is a "nexus" determined?

Justice Kennedy did, however, recognize the requirement that the word "navigable" in "navigable waters" be given some importance. *Id.* at 2247 ("Nevertheless, the word 'navigable' in the Act must be given some effect.") (citing SWANCC). "[T]he dissent would permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters. *Id.* The deference owed to the Corps' interpretation of the statute does not extend so far." *Id.* Justice Kennedy went on to lay out his "significant nexus" test. *Id.* at 2248 ("with the need to give the term 'navigable' some meaning, the Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense").

■ Because Justice Kennedy failed to elaborate on the "significant nexus" required, this Court will look to the prior reasoning in this circuit. The Fifth Circuit, as discussed above, has interpreted "the waters of the United States" narrowly under the OPA. Without any clear direction on determining a significant nexus, this Court will do exactly as Chief Justice Roberts declared—"feel [its] way on a case-by-case basis." *Id.* at 2236 (Roberts, C.J., concurring). Thus, as a matter of law in this circuit, the connection of generally dry channels and creek beds will not suffice to create a "significant nexus" to a navigable water simply because one feeds into the next during the rare times of actual flow.

■ Here, it is undisputed that the unnamed channel/tributary into which the spill from the ruptured pipe occurred is not a navigable-in-fact water. Nor can it be seriously contended that, 500 feet down the unnamed channel/tributary from the spill, at the confluence with Ennis Creek, Ennis Creek is a navigable-in-fact water. Here, the unnamed channel/tributary at issue into which the oil spilled is strikingly similar to a dry arroyo described by Justice Scalia in the plurality opinion as being the "most implausibl[e] of all" in which to find the sweeping assertion of jurisdiction over ephemeral channels. *Id.* at 2218 (describing the washes and arroyos of an arid development site located in the middle of the desert, through which water courses during periods of heavy rain, as the most implausible of all factual scenarios previously addressed by lower courts in finding jurisdiction under the CWA); *id.* at 2220–21 ("In applying the definition to 'ephemeral streams,' . . . and dry arroyos in the middle of the desert, the Corps has stretched the term 'waters of the United

States' beyond parody.").[12] Here, the United States does not seem to assert that water is present ordinarily in the unnamed channel/tributary at issue. Rather, it alleges just the opposite. (Pl. Br. 10–11 (defining the unnamed channel/tributary, Ennis Creek, and Rough Creek as "intermittent" while admitting that only during times of flow is there an unbroken surface water tributary connection to the Brazos River); Pl. Orig. Compl. 5, ¶ 23 (acknowledging that the unnamed channel/tributary and Ennis Creek "are intermittent streams" that flow "during and after rainfall events")). Merely relying upon the fact that oil spilled into the unnamed channel/tributary and then traversed to Ennis Creek will not suffice if neither is classified as "the navigable waters of the United States." The Fifth Circuit has clearly stated that "the proper inquiry is whether ... the site of the farthest traverse of the spill, is *navigable-in-fact* or adjacent to an open body of navigable water." *Needham*, 354 F.3d at 346 (citing *Rice v. Harken Exploration Co.*, 250 F.3d 264, 269 (5th Cir.2001) (emphasis added)). Therefore, this Court must look to see if there is a genuine issue of material fact as to whether the farthest traverse of the spill is a navigable-in-fact water or adjacent to an open body of navigable water.[13]

▮ The only evidence as to "the farthest traverse of the spill" is a speculative declaration that the oil could have been or might possibly be carried downgrade. (Pl. App. 65, ¶ 13 (Declaration of Allen Medine)). Although the United States directed the Court to the Declaration of Allen Medine, that declaration merely stated that "*on average*, during most of the months of the year, there would be rainfall events in the area of Chevron Pipe Line Company's oil spill that would generate sufficient flow to convey crude oil contamination from the spill site through the unnamed tributary creek, Ennis Creek, Rough Creek, the Double Mountain Fork of the Brazos River, and ultimately to the Brazos River." (Pl.App.65, ¶ 13.) The United States goes on to argue that the exhibit cited by Mr. Medine in support of his conclusion is contained at page 90 of its Appendix. (Pl. Br.11–12.) However, the paragraph of Mr. Medine's Declaration and the supporting exhibit do not state that sufficient flow *actually occurred* in this instance during the relevant time frame. Rather, the supporting exhibit is merely a chart showing the 30–year averages for temperatures and rainfall for a given month of the year. Thus, the Declaration of Mr. Medine and its supporting exhibit are not competent evidence that a sufficient rainfall event *actually* occurred at the site and *actually* conveyed crude contamination to either the Double Mountain Fork of the Brazos River or the Brazos River. Rather, the Declaration merely states that the 30–year average rainfall amount for the months in question could be sufficient to carry crude oil down gradient from the spill site.

Besides resting on speculation, the United States failed to direct the Court to evidence showing whether any oil from the spill actually reached "the navigable waters of the United States"—as that term is defined in *Needham* or in the Supreme Court's plurality opinion in *Rapanos*. The Fifth Circuit has clearly directed that the reaches of the CWA are not so unbounded

12. Under Justice Scalia's reasoning, the term "navigable waters" "includes, at bare minimum, the *ordinary* presence of water." *Rapanos*, 126 S.Ct. at 2220–21 (emphasis added).

13. The United States seems to take the position at the summary judgment stage of pro-

ceedings that there is no "need for case-specific proof of potential effects." (Pl.Br.42–43.) Yet, a case-by-case analysis is what each court is left with following the *Rapanos* decision.

as to allow the unnamed channel/tributary and Ennis Creek at its juncture with the unnamed channel/tributary to be covered by the CWA.

The Declaration of Mr. Medine also states in paragraph 12 that "unless removed by a thorough cleanup," oil that was discharged in the spill would be transported *"during times of flow"* down Ennis Creek to Rough Creek and thence into the Double Mountain Fork of the Brazos River and the Brazos River. (Pl.App. 65, § 12 (emphasis added)).[14] However, there is no evidence in the record of such an event occurring—that is, the United States has failed to direct the Court to evidence that crude oil was *actually* transported by stream flow during a time of flow to a navigable-in-fact water or open body of water. *See Needham,* 354 F.3d at 346 ("the site of the farthest traverse of the spill, is *navigable-in-fact* or adjacent to an open body of navigable water"). If the unnamed channel/tributary and Ennis Creek do not fit within "the navigable waters of the United States," then some evidence would be required that crude oil actually reached a navigable waterway—some evidence more than speculation that such an event *could* occur. The United States' argument that a couple of areas of contamination might have still existed even following rigorous cleanup efforts at the time of the first measured rainfall event in the *area* (which in itself is not clear evidence of a certain amount of rainfall at the specific site of the spill required to create

a flow in the unnamed channel/tributary) is not competent summary judgment evidence that crude oil actually reached "the navigable waters of the United States." (Pl. Br. 28–29 (arguing that reports indicated two areas of contamination existed after the first measurable rainfall event following the spill)).

Thus, absent actual evidence that the site of the farthest traverse of the spill is *navigable-in-fact* or adjacent to an open body of navigable water, the Court finds that a "significant nexus" is not present under the law of this circuit.

## V.

## CONCLUSION

Therefore, based upon the arguments contained in Chevron's Brief in Support of its Motion for Summary Judgment, as well as the Fifth Circuit's reasoning contained in *In re Needham* and the Supreme Court's plurality opinion in *Rapanos v. United States,* this Court finds that the subject discharge of oil did not reach navigable waters of the United States and adjoining shorelines.[15] Accordingly, Chevron's Motion for Summary Judgment is **GRANTED.**

SO ORDERED this 28th day of June, 2006.

---

14. "During times of flow" is the heart of the matter. Chevron argues that there is no flow absent a significant rainfall event. Thus, to simply declare that "during times of flow" oil would be transported to a navigable-in-fact watercourse is unhelpful to the government's argument.

 If the effects of the pollutant have occurred upon a navigable-in-fact water, or is so likely to occur as the United States argues, then it should not be too onerous a task for the

United States to come forward with some actual, concrete evidence at the summary judgment stage showing the pollutant reached a navigable-in-fact water or waters adjacent to an open body of navigable water.

15. Likewise, even under Justice Kennedy's required test, this Court concludes that the United States has failed to establish a "significant nexus" with competent summary judgment evidence.