# United States Court of Appeals
## For the First Circuit

No. 05-1444

UNITED STATES,

Plaintiff, Appellee,

v.

CHARLES JOHNSON, GENELDA JOHNSON,
FRANCIS VANER JOHNSON, and JOHNSON CRANBERRIES, LLP

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, Senior U.S. District Judge]

Before
Torruella and Lipez, Circuit Judges,
and DiClerico,* District Judge.

Malcolm Reed Hopper, with whom Gregory T. Broderick was on brief for appellants.
John L. Smeltzer, with whom Kelly A. Johnson, Acting Assistant Attorney General and Ellen Durkee, Attorney, Department of Justice Environment & Natural Resources Division, were on brief for appellee.

October 31, 2006

_____

* Of the District of New Hampshire, sitting by designation.

**LIPEZ**, **Circuit Judge**. Following the panel's decision in this case, see United States v. Johnson, 437 F.3d 157 (1st. Cir. 2006), appellants moved for rehearing en banc, noting the Supreme Court's grant of certiorari in United States v. Rapanos, 376 F.3d 629 (6th Cir. 2004). We held their petition in abeyance pending a decision in that case. Following the decision in Rapanos v. United States, 547 U.S. ___, 126 S.Ct. 2208 (2006), appellants supplemented their previous petition. They request that we grant rehearing en banc to resolve the conflict between the panel decision and Rapanos, or, alternately, that we vacate the decision with prejudice on the ground that the evidence in the record supports a judgment in their favor. The government filed a response requesting that we vacate our previous decision and remand to the district court. After careful consideration, we vacate and remand for further proceedings consistent with Rapanos, as described below.

## I.  The Panel Decision

This case began when the United States filed a civil action alleging that defendants (now appellants), a group of cranberry farmers in Carver, Massachusetts, had discharged pollutants into federally-regulated waters without a permit in violation of § 301 and § 502 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311, 1352. In response, appellants contended that the

-2-

United States lacked jurisdiction over the three properties in question: (1) the Cross Street site; (2) the Fosdick Street site; and (3) the Forest/Fuller Street site (collectively, the "target sites").

In separate rulings on liability and remedy, the district court granted summary judgment in favor of the government. The district court denied appellants' motion for reconsideration, stating that "there is a sufficient basis for the United States to exercise jurisdiction because the undisputed evidence shows that the three wetlands are hydrologically connected to the navigable Weweantic River by nonnavigable tributaries."

In an appeal to this court, appellants challenged the district court's judgment that the jurisdiction of the CWA extends to the target sites. First, they asserted that their property is not covered by the Environmental Protection Agency ("EPA") regulation promulgated to carry out the CWA. In the alternative, appellants argued that, if their property is covered by the regulation, either the regulation exceeds the authority granted by the CWA, or the CWA exceeds Congress's authority under the Commerce Clause.

We affirmed the trial court's judgment in a divided decision, with two members of the panel concurring in the judgment for different reasons, and one member dissenting. One member of the majority concluded that the hydrological connection between the

target sites and the Weweantic River establishes a "significant nexus" between the sites and the river, sufficient to establish jurisdiction under the CWA without creating constitutional issues under the Commerce Clause.  For two of the target sites, in the view of this judge, the hydrological connection depended on diffusion of water through wetlands.  See 437 F.3d at 162.

The other member of the majority read the record differently to conclude that the hydrological connection was a system of tributaries, some of which happened to flow through wetlands or other bogs.  See id. at 182.  The concurring panelist thus concluded that it was unnecessary to decide whether the diffusion of water through wetlands was a sufficient hydrological connection to support a "significant nexus."  Id.

The dissent concluded that the United States "may not constitutionally regulate wetlands that are neither themselves navigable nor truly adjacent to navigable waters."  Id. at 187 (internal quotations and citation omitted).  Moreover, even if the EPA's assertion of jurisdiction was constitutional, the dissent would have held that the government's attempt to assert jurisdiction over appellants' wetlands is inconsistent with its own regulations because the system of tributaries linking the target sites to the Weweantic includes other wetlands.  Because the regulations explicitly exclude wetlands adjacent to waters that are

-4-

themselves wetlands, the dissent argued that the government lacked jurisdiction under its own regulations.  Id. at 187.[1]

## II.  Response to the Panel Decision

As noted, appellants filed a petition for rehearing en banc pursuant to Rule 35 of the Federal Rules of Appellate Procedure,  arguing that the case should be reheard following the Supreme Court's then-pending decision in Rapanos.  We ordered appellants' petition held in abeyance pending the Supreme Court's decision in Rapanos.  We further stated that appellants could file a supplemental petition for rehearing en banc within fourteen days after the decision in Rapanos was issued, and the government could then respond.

## III.  Rapanos v. United States

The decision in Rapanos v. United States, 547 U.S. ___, 126 S.Ct. 2208 (2006), resolved two consolidated cases from the Sixth Circuit.  In one case, the United States brought an enforcement action alleging that property owners and their affiliated businesses deposited fill materials into wetlands without a permit, in violation of the CWA.  Id. at 2219.  In the

---

[1]The regulation states that "waters of the United States" include "[w]etlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (s)(1)-(6) of this section." 40 C.F.R. § 230.3(s)(7).

other, property owners were denied a permit to deposit fill material in a wetland approximately one mile from a lake and, after exhausting their administrative appeals, they filed suit. Id.

In both cases, the district court found that there was federal regulatory jurisdiction over the sites in question, and the Sixth Circuit affirmed. The Supreme Court then consolidated the cases and granted certiorari to decide whether these wetlands constitute "waters of the United States" under the CWA, and, if so, whether the CWA is constitutional. See id. at 2220.

The Court issued a split decision construing the phrase "waters of the United States" as used in the CWA. The plurality concluded that the phrase "waters of the United States" includes only "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" Id. at 2225. Thus, for purposes of determining federal regulatory jurisdiction, "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." Id. at 2226 (emphasis in original). The plurality vacated the decision of the Sixth Circuit in both cases and, noting "the paucity of the record," remanded for further proceedings. Id. at 2235.

Justice Kennedy concurred in the judgment, but rejected the plurality's rationale. Instead, he concluded that jurisdiction extends to wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." Id. at 2236. Justice Kennedy further found that wetlands "possess the requisite nexus" if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Id. at 2248. Where the wetlands in question are "adjacent to navigable-in-fact waters, [the government] may rely on adjacency to establish its jurisdiction." Id. at 2249. Where the wetlands are adjacent to nonnavigable tributaries, "[a]bsent more specific regulations . . . [the government] must establish a significant nexus on a case-by-case basis." Id. at 2249.

Justice Stevens authored a dissent joined by three other Justices. In the view of the dissenters, to the extent that the CWA includes a "significant nexus" requirement, this requirement "is categorically satisfied as to wetlands adjacent to navigable waters or their tributaries." Id. at 2263-64. The dissent concluded by noting specifically that "all four Justices who have joined this opinion would uphold the Corps' jurisdiction . . . in all other cases in which either the plurality's or Justice Kennedy's test is satisfied . . . ." Id. at 2265.

-7-

## IV.  Subsequent Motions

Following the Supreme Court's decision in <u>Rapanos</u>, appellants filed a supplemental petition for rehearing en banc challenging the view in one of the panel opinions that a hydrological connection constitutes a jurisdictionally sufficient "significant nexus."  Appellants contend that rehearing is necessary to resolve the tension between the panel opinion and <u>Rapanos</u>.  They argue that under either the plurality opinion or Justice Kennedy's concurrence, a hydrological connection is insufficient to establish jurisdiction, although they also argue strenuously that the plurality's test alone should apply.  Alternatively, appellants contend that the evidence in the record is sufficient to support a finding in their favor under the standards in <u>Rapanos</u>, and urge that we vacate the decision and direct the district court to enter judgment for them.

The United States opposes the petition for en banc review and urges us instead to vacate the panel's decision and remand the case to the district court.  The government argues that additional factfinding is necessary before the legal principles articulated in <u>Rapanos</u> can be applied in this case.  Moreover, the government asserts that on remand it should be allowed to establish CWA jurisdiction under either the <u>Rapanos</u> plurality's test or Justice Kennedy's test.

## V. Remand to the District Court

We agree with the government that remand to the district court for application of the Rapanos standards is appropriate. The parties presented their cases in the district court without any awareness of the standards that now apply. They should now have an opportunity to develop their positions in the district court with an awareness of these standards. However, the question of what legal standard to apply is one of some complexity, and other courts have taken varying approaches to the issue. We conclude that the United States may assert jurisdiction over the target sites if it meets either Justice Kennedy's legal standard or that of the plurality. We explain our reasoning.

### A. Other Courts' Application of Rapanos

In the months since Rapanos, four courts have applied its legal standards - two district courts and two courts of appeals.

### 1. Decisions of District Courts

In United States v. Evans, 2006 WL 2221629 (M.D. Fla. Aug. 2, 2006), the Middle District of Florida adopted Justice Stevens's suggestion to apply either the plurality's or Justice Kennedy's standard. That court cited the Supreme Court's decision in Marks v. United States for the proposition that "[w]hen a fragmented Court decides a case and no single rationale explaining the result

enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Evans at \*19 (citing Marks v. United States, 430 U.S. 188, 193 (1977)). The court noted that "'narrowest grounds' is understood as the 'less far-reaching' common ground," Evans at \*19 (citing Johnson v. Bd. of Regents of the Univ. of Ga., 263 F.3d 1234, 1247 (11th Cir. 2001)), but found that because the plurality and Justice Kennedy articulated different standards for application on remand it was unclear which would control. Hence, the court adopted Justice Stevens's approach. Evans at \*19.

The Northern District of Texas used a sharply contrasting approach in United States v. Chevron Pipe Line Co., 437 F.Supp.2d 605 (N.D. Tex. 2006), determining that because of the lack of a clear legal standard in Rapanos, it would instead rely on precedent within its own circuit. The court noted that "the Supreme Court failed to reach a consensus of a majority as to the jurisdictional boundary of the CWA." It added that Justice Kennedy "advanced an ambiguous test--whether a 'significant nexus' exists to waters that are/were/might be navigable. This test leaves no guidance on how to implement its vague, subjective centerpiece. That is, exactly what is 'significant' and how is a 'nexus' determined?" Id. at 613 (internal citation omitted). The court then concluded:

> Because Justice Kennedy failed to elaborate on the 'significant nexus' required, this Court will look to the

-10-

prior reasoning in this circuit. The Fifth Circuit, as discussed above, has interpreted 'the waters of the United States' narrowly under the OPA. Without any clear direction on determining a significant nexus, this Court will do exactly as Chief Justice Roberts declared--'feel [its] way on a case-by-case basis.'

Id. The court did not discuss Justice Stevens's instruction.

## 2. Decisions of Courts of Appeals

The Ninth Circuit, the first circuit court to apply Rapanos, concluded without analysis that Justice Kennedy's concurrence provides the controlling test. No. Cal. River Watch v. City of Healdsburg, 457 F.3d 1023 (9th Cir. 2006). The court stated:

Justice Kennedy, constituting the fifth vote for reversal, concurred only in the judgment and, therefore, provides the controlling rule of law. See Marks v. United States, 430 U.S. 188, 193 (1977) (explaining that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.").

Id. at 1029. Without further discussion, the Ninth Circuit applied Justice Kennedy's test. The court did not acknowledge Justice Stevens's instruction.

Most recently, in United States v. Gerke Excavating, Inc., 2006 WL 2707971 (7th Cir. Sept. 22, 2006), the Seventh Circuit also found that Justice Kennedy's test is controlling without discussing Justice Stevens's instruction. The court paraphrases Marks v. United States:

When a majority of the Supreme Court agrees only on the outcome of a case and not on the ground for that outcome, lower-court judges are to follow the narrowest ground to which

-11-

a majority of the Justices would have assented if forced to choose. In Rapanos, that is Justice Kennedy's ground.

Id. at *1 (citing Marks, 430 U.S. at 193). Curiously, without explanation, the court equates the "narrowest opinion" with the one least restrictive of federal authority to regulate. It states:

> The plurality Justices thought that Justice Kennedy's ground for reversing was narrower than their own, because they concluded their extensive and in places harsh criticism of the concurrence by saying that 'Justice Kennedy tips a wink at the agency [i.e., the Corps of Engineers], inviting it to try its same expansive reading again.'
> . . .
> [Justice Kennedy's] test is narrower (*so far as reining in federal authority is concerned*) than the plurality's in most cases, though not in all because Justice Kennedy also said that 'by saying the Act covers wetlands (however remote) possessing a surface-water connection with a continuously flowing stream (however small), the plurality's reading would permit applications of the statute as far from traditional federal authority as are the waters it deems beyond the statute's reach.'

Id. at *1, *2 (quoting Rapanos, 126 S.Ct. at 2234 n.15 & 2246) (emphasis added). Gerke concludes by acknowledging the following anomaly: If Justice Kennedy finds federal jurisdiction over a particular site using the "significant nexus" test the four dissenters would also find jurisdiction. However, if Justice Kennedy does not find federal jurisdiction, there could be instances where both the plurality and the dissent disagree with his conclusion. Id. at *2. In other words, there could be a case in which Justice Kennedy

> would vote against federal authority only to be outvoted 8-to-1 (the four dissenting Justices plus the members of the Rapanos plurality) because there was a slight surface hydrological connection. The plurality's insistence that the

-12-

issue of federal authority be governed by strict rules will on occasion align the Justices in the plurality with the Rapanos dissenters when the balancing approach of Justice Kennedy favors the landowner.

Id. However, Gerke writes off this "rare case," concluding that "as a practical matter the Kennedy concurrence is the least common denominator." Id.

### B.  Interpretation of Marks

The Marks directive that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds," Marks, 430 U.S. at 193 (internal citation omitted), has proven troublesome in application for the Supreme Court itself and for the lower courts.  Therefore, the genesis of that directive and its application require scrutiny.

In Marks, the defendant raised a Due Process challenge to his obscenity conviction on the grounds that he had been punished retroactively under a definition of obscenity laid out in Miller v. California, 413 U.S. 15 (1973), when he had actually engaged in the punished conduct prior to the Miller decision.  The "narrowest grounds" approach emerged when the Court examined Miller's predecessor, Memoirs v. Attorney General of the Commonwealth of Massachusetts, 383 U.S. 413 (1966), to determine whether the law had provided fair warning at the time of the defendant's conduct.

-13-

Marks, 430 U.S. at 193-94.  In Memoirs, a majority of the Supreme Court found that a lower court erred in finding a book obscene and thus unprotected by the First Amendment.  However, three Justices felt that materials would not be protected by the First Amendment if they were deemed obscene, Memoirs, 383 U.S. at 418 (Brennan, J.), while two other Justices insisted that the First Amendment provides an absolute shield against government action aimed at suppressing obscenity.  Id. at 421 (Black, J., concurring); id. at 426 (Douglas, J., concurring).  Marks concluded that the opinion excluding obscene materials from First Amendment protection was the "narrowest grounds" for the judgment in Memoirs.

Relatedly, the "narrowest grounds" language of Marks is itself a quotation from a previous Supreme Court case, Gregg v. Georgia, 428 U.S. 153 (1976).  Gregg discusses Furman v. Georgia, 408 U.S. 238 (1972), which examined the constitutionality of the death penalty as imposed under a Georgia statute.  In Furman, five Justices agreed that the death penalty was unconstitutional as imposed in the case.  However, two of these Justices believed that capital punishment was unconstitutional per se, while the other three Justices felt that the death penalty was unconstitutional under the conditions present in the cases before the court but did not necessarily agree that capital punishment was per se unconstitutional.  Gregg concluded: "Since five Justices wrote separately in support of the judgments in Furman, the holding of

the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." 428 U.S. at 169 n.15.

In sum, the cases on which Marks directly relies both involve situations in which the "narrowest ground" was also the ground least restrictive of federal jurisdiction, as the Seventh Circuit indicated in Gerke. However, this coincidence does not necessarily mean that the Supreme Court in Marks equated the "narrowest grounds" of decision in a case with fragmented decisions to the grounds least restrictive of the assertion of federal authority. Such an equation leaves unanswered the question of how one would determine which opinion is controlling in a case where the government is not a party. Moreover, given the underlying constitutional question presented by Rapanos, it seems just as plausible to conclude that the narrowest ground of decision in Rapanos is the ground most restrictive of government authority (the position of the plurality), because that ground avoids the constitutional issue of how far Congress can go in asserting jurisdiction under the Commerce Clause. See Rapanos, 126 S.Ct. at 2224 (plurality opinion). The appellants argue for that result here.

As an alternative to the Seventh Circuit's reading of Marks, one might sensibly conclude, as one court has, that the "narrowest grounds" are simply understood as the "less far-reaching-common

-15-

ground." Johnson v. Bd. of Regents of the Univ. of Ga., 263 F.3d 1234, 1247 (11th Cir. 2001); see also Mark Alan Thurmon, Note, *When the Court Divides: Reconsidering the Precedential Value of Supreme Court Plurality Decisions*, 42 Duke L.J. 419, 420-21 (1992) (quoting Linda Novak, Note, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Colum. L. Rev. 756, 763 (1980) ("One way to determine the 'narrowest grounds' is to look for the opinion 'most clearly tailored to the specific fact situation before the Court and thus applicable to the fewest cases, in contrast to an opinion that takes a more absolutist position or suggests more general rules.'"). This reading is also consistent with Memoirs and Furman: in both cases, the opinion deemed "narrowest" was the one more closely tailored to the specific situation the Court confronted.

Even if we take this more sensible approach to Marks, however, the case still poses problems in the situation before us. As the D.C. Circuit held in an en banc opinion, "Marks is workable - one opinion can be meaningfully regarded as 'narrower' than another - only when one opinion is a logical subset of other, broader opinions." King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). In other words, the "narrowest grounds" approach makes the most sense when two opinions reach the same result in a given case, but one opinion reaches that result for less sweeping reasons than the other. When applied to future cases, the less sweeping opinion

-16-

would require the same outcome in a subset of the cases that the more sweeping opinion would. For example, in Furman, the Justices who concluded that capital punishment was per se unconstitutional would always strike down future death penalty sentences, but the Justices who found only that the death penalty was unconstitutional as administered in Furman would only strike down capital sentences in a subset of future capital cases. Similarly, in Memoirs, the absolutist view of the First Amendment held by two Justices would always require a ruling in favor of protecting speech, but the view of three other Justices that only non-obscene speech is protected would extend First Amendment protection only to a subset of such cases. Thus, the less sweeping opinion in each case represents the "narrowest grounds" for the decision.

This understanding of "narrowest grounds" as used in Marks does not translate easily to the present situation. The cases in which Justice Kennedy would limit federal jurisdiction are not a subset of the cases in which the plurality would limit jurisdiction. As Gerke points out, in cases where there is a small surface water connection to a stream or brook, the plurality's jurisdictional test would be satisfied, but Justice Kennedy's balancing of interests might militate against finding a significant nexus. In such a case, if Justice Kennedy's test is the single controlling test (as advocated by the Seventh and Ninth Circuits), there would be a bizarre outcome -- the court would find no federal

-17-

jurisdiction even though eight Justices (the four members of the plurality and the four dissenters) would all agree that federal authority should extend to such a situation. This possibility demonstrates the shortcomings of the Marks formulation in applying Rapanos.

## C. The Rapanos Dissent's Approach

Justice Stevens foresaw the possibility that the plurality might find jurisdiction in some cases where Justice Kennedy does not. His instruction to find jurisdiction where either test is satisfied provides a simple and pragmatic way to assess what grounds would command a majority of the Court. Justice Stevens observes:

> I assume that Justice Kennedy's approach will be controlling in most cases because it treats more of the Nation's waters as within the Corps' jurisdiction, but in the unlikely event that the plurality's test is met but Justice Kennedy's is not, courts should also uphold the Corps' jurisdiction. In sum, in these and future cases the United States may elect to prove jurisdiction under either test.

Rapanos, 126 S.Ct at 2265 n.14. Following Justice Stevens's instruction ensures that lower courts will find jurisdiction in all cases where a majority of the Court would support such a finding. If Justice Kennedy's test is satisfied, then at least Justice Kennedy plus the four dissenters would support jurisdiction. If the plurality's test is satisfied, then at least the four plurality members plus the four dissenters would support jurisdiction. Other

-18-

circuits have previously taken this common sense approach to fragmented opinions. See, e.g., Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1182 (2d Cir. 1992) ("In essence, what we must do is find common ground shared by five or more justices."); United States v. Williams, 435 F.3d 1148, 1157 (9th Cir. 2006) ("We need not find a legal opinion which a majority joined, but merely a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree." (internal quotation marks and citations omitted)).

We note that one circuit court has previously reached a conclusion at odds with the position Justice Stevens now advocates. In King v. Palmer, the D.C. Circuit stated that "we do not think we are free to combine a dissent with a concurrence to form a Marks majority." 950 F.2d at 783. King discussed Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711 (1987) (Delaware Valley II), in which the Supreme Court considered the availability and amount of contingency fees under federal fee-shifting statutes. In Delaware Valley II, the Court ultimately issued a plurality opinion signed by four Justices, a dissent signed by four Justices, and a concurrence by Justice O'Connor. The D.C. Circuit refused to examine the points of commonality among Justice O'Connor's opinion and that of the dissent, relying mainly on a literal reading of Marks's language that the holding is the position of the Justices "who *concurred in the judgments* on the

-19-

narrowest grounds," Marks, 430 U.S. at 193 (emphasis added), as well as the fact that the Supreme Court had not explicitly applied Marks to situations where concurring and dissenting votes would be combined. King, 950 F.2d at 783.

However, the situation in King is different from the case before us. In Delaware Valley II, Justice O'Connor and the dissenting Justices simply took different approaches to the question of how to calculate a contingency enhancement, with the result that it is not immediately obvious how their views could be combined to form a five-Justice majority. In Rapanos, Justice Stevens states that whenever either the plurality or Justice Kennedy would find jurisdiction, the Rapanos dissenters would agree. Moreover, the Third Circuit took a position opposite to that of the D.C. Circuit in interpreting Delaware Valley II, holding that "[b]ecause the four dissenters would allow contingency multipliers in all cases in which Justice O'Connor would allow them, her position commands a majority of the court." Student Pub. Interest Research Group of N.J., Inc. v. AT&T Bell Labs., 842 F.2d 1436, 1451 (3d. Cir. 1988). Therefore, we do not share the reservations of the D.C. Circuit about combining a dissent with a concurrence to find the ground of decision embraced by a majority of the Justices.

Moreover, Justice Stevens's instruction seems particularly sound given that the Supreme Court itself has moved away from the

-20-

Marks formula. In Nichols v. United States, the court observed that "[t]his test is more easily stated than applied," adding, "[w]e think it not useful to pursue the Marks inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it." 511 U.S. 738, 745-46 (1994); see also Grutter v. Bollinger, 539 U.S. 306, 325 (2003) (quoting Nichols for the same proposition). Since Marks, several members of the Court have indicated that whenever a decision is fragmented such that no single opinion has the support of five Justices, lower courts should examine the plurality, concurring and dissenting opinions to extract the principles that a majority has embraced. See Waters v. Churchill, 511 U.S. 661, 685 (1994) (Souter, J., concurring) (analyzing the points of agreement between plurality, concurring, and dissenting opinions to identify the test that lower courts should apply); League of United Latin Am. Citizens v. Perry, 126 S. Ct. 2594, 2607 (2006) (Kennedy, J.) (analyzing Vieth v. Jubelirer, 541 U.S. 267 (2004) to find that agreement among one concurring and four dissenting Justices establishes majority support for a legal proposition); Alexander v. Sandoval, 532 U.S. 275, 281-82 (2001) (Scalia, J.) (noting the agreement of five Justices who joined plurality and various dissenting opinions). Thus, it is not surprising that Justice Stevens in his Rapanos dissent explicitly directs courts to examine the views of dissenting Justices to determine which propositions

-21-

have the support of a majority.  This approval is consistent with the direction that the Court as a whole has taken since <u>Marks</u>. Moreover, the fact that Justice Stevens does not even refer to <u>Marks</u> indicates that he found its framework inapplicable to the interpretation by the lower courts of the divergent tests laid out by the opinions in <u>Rapanos</u>.

## VI.  Conclusion

The foregoing considerations lead us to conclude that the district court should do exactly as Justice Stevens has suggested. The federal government can establish jurisdiction over the target sites if it can meet either the plurality's or Justice Kennedy's standard as laid out in <u>Rapanos</u>.

In light of these standards, the district court may conduct additional factfinding if it deems it necessary to address the jurisdictional question.  The district court may also address any other issues it deems necessary in deciding that jurisdictional issue.  As discussed previously, the two members of the majority each had different interpretations of the record. We urge the parties and the district court to provide a clear factual record in the context of applying the new standards.

Accordingly, we vacate our decision in <u>United States</u> v. <u>Johnson</u>, 437 F.3d 157 (1st Cir. 2006), and remand for further proceedings.  Each party is to bear its own costs.

So ordered.

**- Concurring/Dissenting Opinion Follows -**

**TORRUELLA, <u>Circuit Judge</u> (Concurring in part, Dissenting in part).** I join the majority in remanding the case to the district court so that the new legal standards developed in <u>Rapanos v. United States</u>, 547 U.S. ___, 126 S. Ct. 2208 (2006), can be applied on the first instance by that court after the parties have had an opportunity to expand the record to the extent necessary given the new standards. The opportunity to expand the record is important to both the government <u>and</u> the Johnsons. New evidence is as likely to militate against federal regulatory jurisdiction over the Johnsons' property as it is to demonstrate it.

I depart from the majority in interpreting what standards <u>Rapanos</u> has established. The plurality's "hydrological connection" test provides the proper constitutional limit on federal regulation under the Clean Water Act. Although the majority has provided an able analysis of a thorny issue, I cannot concur that Justice Kennedy's seemingly opaque "significant nexus" test is a constitutional measure of federal regulatory jurisdiction. Extending regulatory jurisdiction to wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made . . ." <u>id.</u> at 2236, leaves the door open to continued federal overreach. The plurality's restriction of federal jurisdiction to "<u>only</u> those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear

-24-

demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the [Clean Water] Act . . ." id. at 2226 (emphasis in original), strikes a constitutional balance between federal and state regulatory interests, and our nation's interest in clean water and the individual land owner's right to manage their property in accordance with their dreams and aspirations, whether economic or otherwise.