[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 24, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-17019

_____

D. C. Docket No. 04-00199-CR-2-RBP-RRA

UNITED STATES OF AMERICA,

Plaintiff-Appellee-
Cross-Appellant,

versus

CHARLES BARRY ROBISON,

Defendant,

MCWANE, INC.,

Defendant-Appellant,

JAMES DELK,
MICHAEL DEVINE,

Defendants-Appellants-
Cross-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(October 24, 2007)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and FORRESTER,[*] District Judge.

HULL, Circuit Judge:

Defendants McWane, Inc. ("McWane"), James Delk ("Delk"), and Michael Devine ("Devine") appeal their convictions for their roles in a Clean Water Act ("CWA") conspiracy (Count 1), as well as their convictions for substantive violations of the CWA (Counts 2, 3, 5, 7-19, 21, and 22).[1] After the defendants' convictions, the United States Supreme Court addressed how to define "navigable waters" under the CWA in Rapanos v. United States, __ U.S. __, 126 S. Ct. 2208 (2006). The definition of "navigable waters" in the jury charge in this case was erroneous under Rapanos, and the government has not shown that the error was harmless. Accordingly, we must vacate defendants' CWA convictions and remand the case for a new trial.

McWane also appeals its conviction for making a false statement to the Environmental Protection Agency ("EPA") (Count 24).[2] Because McWane was

---

[*]Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

[1]Counts 12-19, 21, and 22 of the superseding indictment only charged McWane and Delk, while Counts 2, 3, 5, and 7-11 charged McWane, Delk, and Devine. Before the case was submitted to the jury, the government dismissed Count 11 as to Devine.

[2]Count 24—the false statement count in the superseding indictment—was ultimately submitted to the jury as Count 23. For consistency, we refer to the false statement count throughout this opinion as "Count 24."

entitled to a judgment of acquittal on that charge, we vacate McWane's conviction on Count 24 as well.

## I. BACKGROUND

### A. Defendants

Defendant McWane is a large manufacturer of cast iron pipe, flanges, valves, and fire hydrants. McWane has numerous manufacturing plants. This case concerns McWane's plant in Birmingham, Alabama (hereinafter "the plant" or "McWane's plant").

Defendants Delk and Devine, along with Charles "Barry" Robison and Donald Harbin, worked in management positions at McWane's plant at all relevant times.

Robison was McWane's Vice President of Environmental Affairs. Defendant Delk was the General Manager of the plant. Defendant Devine was the Plant Manager, and he reported to defendant Delk. Harbin was the Maintenance Manager, and he reported to defendant Devine.[3]

### B. Avondale Creek

The CWA violations at issue involve McWane's discharge of pollutants into

---

[3]When defendant Delk was hired as the General Manager—in 1998—Harbin was the Plant Manager. Defendant Delk demoted Harbin to the Maintenance Manager and hired defendant Devine to replace Harbin as the Plant Manager.

Avondale Creek, which is adjacent to McWane's plant.

Avondale Creek flows into another creek called Village Creek. In turn, Village Creek flows approximately twenty-eight miles into and through Bayview Lake, which was created by damming Village Creek. On the other side of Bayview Lake, Village Creek becomes Locust Fork, and Locust Fork flows approximately twenty miles out of Bayview Lake before it flows into the Black Warrior River.

At trial, the government presented testimony, inter alia, from an EPA investigator (Fritz Wagoner) that Avondale Creek is a perennial stream with a "continuous uninterrupted flow" into Village Creek. Wagoner testified that there is "a continuous uninterrupted flow" not only from Avondale Creek into Village Creek, but also from Village Creek through Bayview Lake and into Locust Fork, and ultimately into the Black Warrior River.

On cross-examination, Wagoner admitted that he did not conduct a "tracer test" to check the flow of Avondale Creek into the Black Warrior River. Wagoner explained that a "tracer test" is a procedure whereby a "concentrated dye" is put into a body of water and tracked to determine "where that water body flows." Wagoner conducted no tests to measure the volume of water discharged from Avondale Creek or between the bodies of water that connect Avondale Creek and

4

the Black Warrior River. He conceded that the water level in Avondale Creek was so low that he was able to walk through Avondale Creek all the way down to its intersection with Village Creek. Furthermore, Wagoner testified that Village Creek is dammed (creating Bayview Lake) and that the dam runs "all the way across Village Creek." Wagoner's only site visit was in April 2005. This was more than four years after the violations at issue in this case.

The government presented no evidence, through Wagoner or otherwise, of the chemical, physical, or biological effect that Avondale Creek's waters had or might have had on the Black Warrior River. Indeed, the district court observed that there was no evidence of any actual harm or injury to the Black Warrior River.

## C.    Defendants' conduct

McWane's plant manufactures eighteen-foot and twenty-foot lengths of pipe. McWane utilizes a great deal of water in its pipe manufacturing processes. The water that runs out of the pipe manufacturing machines is generally referred to as "process wastewater." The evidence at trial established that process wastewater accumulated in large amounts in basements under McWane's "eighteen-foot machine" and "twenty-foot machine." The process wastewater contained various contaminants, including hydraulic oil, excess iron, and trash.

The CWA authorizes the EPA, and states with programs approved by the

5

EPA, to issue permits for the discharge of pollutants, in compliance with the National Pollutant Discharge Elimination Systems ("NPDES"). These permits are known as NPDES permits. The Alabama Department of Environmental Management ("ADEM") administers the NPDES program in Alabama.

McWane obtained an NPDES permit from ADEM that authorized McWane to discharge some process wastewater. Specifically, McWane's NPDES permit allowed it to discharge some treated process wastewater into Avondale Creek, but only from one discharge point at the plant ("DSN001"), and only if other discharge limits and bookkeeping requirements were met. McWane's NPDES permit also allowed it to discharge "storm water runoff from industrial activity" from other discharge points at the plant ("DSN002" through "DSN020"). McWane, however, was not permitted to discharge process wastewater from any point at the plant other than DSN001.

At trial, the government established that McWane discharged process wastewater into Avondale Creek from discharge points other than DSN001, in violation of the express provisions of its NPDES permit. Numerous former McWane employees testified that the plant was in disarray by the late 1990s and that process wastewater was all over the plant. Process wastewater overflowed on a regular basis when it was pumped from the eighteen-foot machine and twenty-

foot machine basements. The process wastewater would then spill into the storm water runoff discharge points (DSN002-DSN020) and flow into Avondale Creek.

One McWane employee described the extent of the process wastewater discharges as "[e]nough to drown a small village." Indeed, multiple witnesses testified that process wastewater from McWane's plant was regularly discharged into Avondale Creek. Harbin, for instance, testified that between May 1999 and January 2001, process wastewater was discharged into storm drains fifteen out of every twenty operating days per month. Other witnesses testified that the plant's basements were pumped (which led to the corresponding noncompliant wastewater discharge) every Friday night.

McWane's NPDES permit listed defendant Delk as one of two people with the authority and responsibility to prevent and abate violations of ADEM's regulations. Trial testimony established that defendant Delk was "everybody's boss" at the plant, and that on multiple occasions, defendant Delk ordered McWane employees to pump process wastewater from the basements, despite knowing that the wastewater had nowhere to go but Avondale Creek. Further testimony established that defendant Delk watched as wastewater spilled or was pumped into the center courtyard of the plant, and that Delk once instructed Harbin to falsify a water sample for inspectors.

Likewise, defendant Devine also ordered McWane employees to violate the NPDES permit. One former employee, Troy Venable, testified that he overheard a conversation between defendant Devine and a McWane maintenance foreman in which Devine said that it would be "easier" for McWane to pay off its fines than to pay $70,000 to fix one of the sources of the problem. There was also testimony about two separate incidents in which defendant Devine ordered that excess process wastewater be pumped from the basements despite there being no appropriate place to put the water, and told employees that he did not care how the water got out of the plant as long as it was gone.

Additionally, McWane's former safety and personnel director, John Walsh, testified that on one occasion, an ADEM inspector came to inquire about pollutant discharges from the storm water discharge runoff points. According to Walsh, defendant Devine directed him to lie to the ADEM inspector and tell the inspector that the cause of the discharges was McWane's test-flushing of fire hydrants. Walsh testified that he complied with defendant Devine's instructions because he "was told to" and feared that if he did not, he would lose his job.

The EPA inspected the plant in April 2000, and subsequently required McWane to submit plant inspection reports and other documents concerning the plant. McWane responded with two separate document productions, on August 17,

2000, and September 15, 2000.  The document productions were accompanied by certifications signed by Robison.

**D.    Indictment**

In May 2004, a twenty-five count indictment was issued against McWane, Delk, Devine, Robison, and Donald Bills (the plant engineer).  The indictment was superseded in July 2004.

Count 1 of the superseding indictment alleged that defendants McWane, Delk, Devine, Robison, and Bills conspired: (1) to knowingly discharge pollutants into the waters of the United States in violation of McWane's NPDES permit and the CWA; (2) to defraud the United States; (3) to knowingly and willfully make false statements; and (4) to obstruct justice.  Counts 2-11 alleged that defendants McWane, Delk, and Devine knowingly caused discharges of pollutants from a storm water outfall (DSN002) into Avondale Creek in each month from May 1999 through February 2000, in violation of McWane's NPDES permit and the CWA.  Counts 12-22 accused McWane and Delk (but not Devine) of similar NPDES and CWA violations from March 2000 through January 2001.

Count 23 alleged that McWane, Delk, and Devine knowingly caused discharges of pollutants from the wastewater outfall (DSN001) on May 26, 1999, in violation of the maximum limits allowed by McWane's NPDES permit and the

9

CWA. Count 24 charged McWane and Robison with making false statements to the EPA on or about August 17, 2000, and September 15, 2000. Finally, Count 25 alleged that McWane obstructed justice by providing false and misleading information to the EPA regarding its discharge of wastewater.

## E. Trial

A jury trial was held in May and June 2005. At the close of the government's evidence, the district court: (1) dismissed Bills from the case;[4] (2) dismissed Robison from Count 1 (conspiracy), leaving Robison only in Count 24; (3) struck three of the four objects of the conspiracy in Count 1, leaving the sole object of the conspiracy as the knowing discharge of pollutants into the waters of the United States in violation of the NPDES permit and the CWA; and (4) dismissed Counts 23 and 25 in their entirety.

On June 10, 2005, the jury returned guilty verdicts on all remaining counts except Counts 4, 6, and 20. All three appellants here, McWane, Delk, and Devine, were convicted of conspiracy to violate the CWA (Count 1), as well as multiple substantive violations of the CWA. McWane, Delk, and Devine were convicted on Counts 2, 3, 5, and 7-10, and McWane and Delk were also convicted on Counts 11-19, 21, and 22. Additionally, McWane and Robison were convicted of making

---

[4]Bills is not a party to this appeal.

a false statement to the EPA (Count 24).[5]

## F.    Sentences

On December 5, 2005, the district court sentenced the defendants.

The district court sentenced: (1) Delk to 36 months' probation (including 6 months of nighttime home detention), and a fine of $90,000;[6] (2) Devine to 24 months' probation (including 3 months of nighttime home detention), and a fine of $35,000;[7] and (3) McWane to 60 months' probation and a fine of $5 million.[8]

## II.  DISCUSSION

The parties' disagreement as to what constitutes a "navigable water" under the CWA is at the heart of this appeal.

## A.    Jury instruction on "navigable waters"

---

[5]Robison is no longer a party to this appeal. Robison initially filed a notice of appeal in this case, but he dismissed his appeal here as part of his resolution of a separate criminal case in Utah involving McWane's violations of the Clean Air Act. See United States v. McWane, Inc., No. 2:05-cr-00811 (D. Utah Feb. 8, 2006).

[6]Defendant Delk's base offense level was 6. After a 4-level enhancement for Delk's leader/organizer role in the offense and other adjustments, the district court calculated Delk's total offense level to be 16. With a criminal history category of I, Delk's advisory guidelines range was 21-27 months' imprisonment.

[7]Defendant Devine's base offense level was 6. After a 3-level enhancement for Devine's manager/supervisor role in the offense and other adjustments, the district court calculated Devine's total offense level to be 15. With a criminal history category of I, Devine's advisory guidelines range was 18-24 months' imprisonment.

[8]The government cross-appeals the sentences of Delk and Devine. Additionally, Delk and Devine attempt to raise a sentencing issue in their response briefs to the government's cross-appeal. Because we vacate Delk's and Devine's convictions, we do not address any of the parties' sentencing arguments and dismiss the government's cross-appeal without prejudice.

11

The CWA generally prohibits the discharge of pollutants into "navigable waters." See 33 U.S.C. §§ 1311(a), 1362(12). Under the CWA, "navigable waters" are defined as "the waters of the United States, including the territorial seas." Id. § 1362(7). The parties agree that the definition of "navigable waters" is a key element of the CWA criminal offenses in this case.

Based on the Supreme Court's Rapanos decision, defendants contend that Avondale Creek is not a "navigable water" within the meaning of the CWA, and that the district court erroneously instructed the jury as to the definition of the term "navigable waters." The government responds that Avondale Creek's connection with the Black Warrior River and/or Village Creek renders Avondale Creek a "navigable water" within the meaning of the CWA.[9]

The problem in this case arises because the district court charged the jury that "navigable waters" include "any stream which may eventually flow into a navigable stream or river," and that such stream may be man-made and flow "only intermittently," as follows:

---

[9]We review the legal correctness of the district court's "navigable waters" jury instruction de novo. United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000). We reject the government's argument that defendants failed to properly preserve an objection to the "navigable waters" jury instruction. Defendants repeatedly made clear to the district court their position as to the appropriate definition of a "navigable water" under the CWA. See Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1329 (11th Cir. 1999). Thus, our review is de novo, not for plain error. Under de novo review, if we determine that there was error, we still must consider whether the government has carried its burden to show that the error was harmless. See Fed. R. Crim. P. 52(a).

12

As to Counts 2 through 22, a "water of the United States" includes any stream which may eventually flow into a navigable stream or river. The Government does not have to prove that the stream into which the discharge is made is itself navigable in fact. What it must prove is that the stream into which the discharge is made may eventually flow directly or indirectly into a navigable stream or river. The stream into which the discharge is made may be a natural or manmade [stream] and may flow continuously or only intermittently, as long as it may eventually flow directly or indirectly into a navigable stream or river whose use affects interstate commerce.

A navigable stream or river is defined as one that is used or is susceptible of being used in its ordinary condition, as a highway for interstate commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

(Emphasis added.)

The district court's jury charge was based, inter alia, on this Court's decision in United States v. Eidson, 108 F.3d 1336 (11th Cir. 1997). In Eidson, we observed: (1) that Congress chose to define broadly the waters covered by the CWA; (2) that it was "well established that Congress intended to regulate the discharge of pollutants into all waters that may eventually lead to waters affecting interstate commerce"; and (3) that courts repeatedly had recognized that tributaries to waters affecting interstate commerce—even when man-made or intermittently flowing—were subject to the CWA. Eidson, 108 F.3d at 1341-42.

However, the defendants' trial occurred before Rapanos, and the Supreme Court indicated in Rapanos that Eidson's "expansive definition" of "'tributaries'"

13

is no longer good law. Rapanos, __ U.S. at __, 126 S. Ct. at 2217 (plurality opinion) (citing, inter alia, Eidson, 108 F.3d at 1340-42). Even the government here tacitly concedes that the jury charge given by the district court in this case was erroneous to some extent in light of Rapanos. See Resp. Br. of United States, at 24-25. Nevertheless, the government contends that any error in the jury charge was harmless and does not require reversal.

Accordingly, we consider Rapanos in detail in order to determine exactly how and to what extent the district court's "navigable waters" instruction was erroneous. We then consider whether the incorrect jury instruction was harmless error.

**B.    Rapanos and the proper definition of "navigable waters"**

In Rapanos, which involved two consolidated cases, the Supreme Court addressed how the statutory term "navigable waters" should be construed under the CWA. The consolidated cases involved the discharge of pollutants into four separate wetlands. See Rapanos, __ U.S. at __, 126 S. Ct. at 2219 (plurality opinion). The wetlands at issue varied in terms of their precise connections to navigable-in-fact bodies of water, but the wetlands were all "near ditches or man-made drains that eventually empt[ied] into traditional navigable waters." Id. In the case of three of the four wetlands, it was "not clear whether the connections

14

between the[] wetlands and the nearby drains and ditches [were] continuous or intermittent, or whether the nearby drains and ditches contain[ed] continuous or merely occasional flows of water." Id. In the case of the fourth wetland, the ditch running alongside the wetland was "separated from it by a 4-foot-wide man-made berm" that was "largely or entirely impermeable to water." Id.

In both cases, the Sixth Circuit concluded that the wetlands were covered by the CWA. Id. The Supreme Court consolidated the cases and granted certiorari to decide whether the wetlands actually constituted "waters of the United States" under the CWA. Id. at __, 126 S. Ct. at 2220.

The entire Supreme Court agreed that the term "navigable waters" encompasses something more than traditionally "navigable-in-fact" waters. Id. at __, 126 S. Ct. at 2220 (plurality opinion); id. at __, 126 S. Ct. at 2241 (Kennedy, J., concurring); id. at __, 126 S. Ct. at 2255 (Stevens, J., dissenting). However, five Justices concluded that remand was necessary for consideration of whether the wetlands at issue were "navigable waters" covered by the CWA, and whether the EPA and the Army Corps of Engineers had impermissibly extended their regulatory authority under the CWA. Id. at __, 126 S. Ct. at 2220 (plurality opinion); id. at __, 126 S. Ct. at 2235-36 (Roberts, C.J., concurring); id. at __, 126 S. Ct. at 2236, 2241, 2251-52 (Kennedy, J., concurring).

15

Despite agreeing that the remand was necessary for further consideration of whether the wetlands at issue were covered by the CWA, the five-Justice majority fractured with regard to the proper definition of the term "navigable waters." Justice Scalia wrote for a four-justice plurality, while Justice Kennedy provided the fifth vote for reversal. Justice Stevens dissented, joined by the remaining three Justices.[10]

### 1. Justice Scalia's plurality opinion

Although Justice Scalia's plurality opinion recognized that the statutory term "'navigable waters' includes something more than traditional navigable waters," the plurality also emphasized that "the qualifier 'navigable' is not devoid of significance." Id. at __, 126 S. Ct. at 2220 (plurality opinion). According to the plurality, "navigable waters" include only "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" Id. at __, 126 S. Ct. at 2225 (alteration in original) (citation omitted). The plurality emphasized that bodies of water such as streams, oceans, rivers, and lakes (i.e.,

_____

[10]Chief Justice Roberts filed a short separate concurrence but also joined Justice Scalia's plurality opinion, along with Justices Thomas and Alito; Justice Breyer filed a short separate dissent but also joined Justice Stevens's dissenting opinion, along with Justices Souter and Ginsburg. Thus, the three "main" opinions in Rapanos are Justice Scalia's plurality opinion (four Justices); Justice Kennedy's concurring opinion (one Justice); and Justice Stevens's dissenting opinion (four Justices).

"navigable waters") are "continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows." Id. at __, 126 S. Ct. at 2221.

Moreover, while the plurality was of the view that "relatively continuous flow is a necessary condition for qualification as a 'water,'" relatively continuous flow, in and of itself, is "not an adequate condition" under the plurality's test. Id. at __ n.7, 126 S. Ct. at 2223 n.7.

The plurality also applied its test to the specific wetlands at issue in Rapanos. Noting that under prior precedent wetlands "adjacent to" navigable bodies of water were considered "waters of the United States," the plurality stated that "only those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." Id. at __, 126 S. Ct. at 2226 (second emphasis added). "Wetlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States' . . . lack the necessary connection to covered waters . . . ." Id. To summarize, the plurality's test for "establishing that wetlands . . . are covered by the Act requires two findings: First, that the adjacent channel [to the wetland] contains 'a water of the United States,' (i.e., a relatively permanent body

17

of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." Id. at __, 126 S. Ct. at 2227 (alteration omitted).

The plurality also noted that although it did not reach the issue, there was "no reason to suppose that [its] construction . . . [would] significantly affect[] the enforcement" of the CWA, in that "lower courts . . . have not characterized intermittent channels as 'waters of the United States.'" Id. The plurality observed that "from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates [the CWA], even if the pollutants discharged . . . do not emit 'directly into' covered waters, but pass 'through conveyances' in between." Id. (citations omitted).

### 2. Justice Kennedy's concurrence

Justice Kennedy supplied the fifth vote for reversal and agreed with the plurality that the Sixth Circuit had failed to apply the proper test as to what constitutes a "navigable water." See id. at __, 126 S. Ct. at 2236 (Kennedy, J., concurring) (stating that the Sixth Circuit "recognized the [proper] test's applicability," but failed to apply it correctly). However, Justice Kennedy

18

disagreed with the plurality over the substance of the proper test.

According to Justice Kennedy, the Supreme Court actually established the test for determining whether a "water or wetland" constitutes a "navigable water" under the CWA five years prior to Rapanos, in Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, 531 U.S. 159, 121 S. Ct. 675 (2001) ("SWANCC"). See Rapanos, __ U.S. at __, 126 S. Ct. at 2236 (Kennedy, J., concurring). Citing SWANCC, Justice Kennedy wrote in his Rapanos concurrence that the applicable test for determining whether or not a "water or wetland" is "navigable" is the so-called "significant nexus" test. See id. at __, 126 S. Ct. at 2236 (Kennedy, J., concurring) (citing SWANCC, 531 U.S. at 167, 172, 121 S. Ct. at 680, 683). In Justice Kennedy's view, a "water or wetland" can only be "navigable" under the CWA if it possesses a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." Id.[11]

Because Rapanos was a wetlands case, Justice Kennedy's concurrence then

[11]In reviewing the Supreme Court's prior precedent, Justice Kennedy also noted: "Taken together these cases establish that in some instances . . . the connection between a nonnavigable water or wetland and a navigable water may be so close, or potentially so close, that the Corps may deem the water or wetland a "navigable water" under the Act. In other instances, as exemplified by SWANCC, there may be little or no connection. Absent a significant nexus [in these latter instances], jurisdiction under the Act is lacking. Because neither the plurality or the dissent addresses the nexus requirement, this separate opinion, in my respectful view, is necessary." Rapanos, __ U.S. at __, 126 S. Ct. at 2241 (Kennedy, J., concurring).

focused on when a wetland meets the "significant nexus" test. A wetland meets the "significant nexus" test if, "either alone or in combination with similarly situated lands in the region, [it] significantly affect[s] the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Id. at __, 126 S. Ct. at 2248. "When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" Id.

Justice Kennedy also emphasized that a "mere hydrologic connection" between a wetland and a navigable-in-fact body of water would not necessarily be sufficiently substantial to meet his "significant nexus" test. Id. at __, 126 S. Ct. at 2250-51. According to Justice Kennedy, a "mere hydrologic connection . . . may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood." Id. at __, 126 S. Ct. at 2251. Under Justice Kennedy's test, the "required nexus must be assessed in terms of the statute's goals and purposes," which are to "'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" Id. at __, 126 S. Ct. at 2248 (citation omitted).

### 3. Justice Stevens's dissent

Justice Stevens, writing for himself and three other Justices, would have

upheld the Army Corps of Engineers' and EPA's broad interpretation of CWA jurisdiction and concluded that the wetlands at issue in Rapanos were "navigable waters," i.e., "waters of the United States." Id. at __, 126 S. Ct. at 2252 (Stevens, J., dissenting).

As aptly noted by Chief Justice Roberts in his concurrence, neither Justice Scalia's plurality opinion, Justice Kennedy's concurrence, nor Justice Stevens's dissent "command[ed] a majority of the Court on precisely how to read Congress'[s] limits on the reach" of the CWA. Id. at __, 126 S. Ct. at 2236 (Roberts, C.J., concurring). In addition, Justice Stevens's dissent noted that "while both the plurality and Justice Kennedy agree that there must be a remand for further proceedings, their respective opinions define different tests to be applied on remand." Id. at __, 126 S. Ct. at 2265 (Stevens, J., dissenting).

Justice Stevens's dissent then stated that the four Justices joining his opinion would uphold CWA jurisdiction in all cases in which either the plurality's or Justice Kennedy's test is met, as follows:

> Given that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases—and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied—on remand each of the judgments should be reinstated if either of those tests is met.

Id. (first emphasis added).

## C.    The governing rule of <u>Rapanos</u>

Given the various opinions, the parties dispute what constitutes the governing definition of "navigable waters" under <u>Rapanos</u>.  The defendants argue that only Justice Kennedy's concurrence (i.e., the "significant nexus" test) applies.  The government responds that if Avondale Creek can be shown to satisfy <u>either</u> the plurality's test or Justice Kennedy's test, that is sufficient to sustain CWA jurisdiction in this case.

The circuits likewise are split on the question of which <u>Rapanos</u> opinion provides the holding.  Both the Seventh and the Ninth Circuits concluded that Justice Kennedy's concurrence controls and adopted the "significant nexus" test.  <u>See</u> <u>N. Cal. River Watch v. City of Healdsburg</u>, 496 F.3d 993, 999-1000 (9th Cir. 2007) ("<u>River Watch II</u>");[12] <u>United States v. Gerke Excavating, Inc.</u>, 464 F.3d 723, 724-25 (7th Cir. 2006), <u>cert. denied</u>, __ U.S. __, __ S. Ct. __, 76 U.S.L.W. 3156

---

[12]The Ninth Circuit's <u>River Watch</u> case resulted in two opinions.  In <u>Northern California River Watch v. City of Healdsburg</u>, 457 F.3d 1023 (9th Cir. 2006) ("<u>River Watch I</u>"), the issue was whether a rock quarry pit called "Basalt Pond" was subject to the CWA.  Basalt Pond contained wetlands that were adjacent to a navigable-in-fact river.  Applying Justice Kennedy's test, the Ninth Circuit concluded that "Basalt Pond and its wetlands possess . . . a 'significant nexus' to waters that are navigable in fact, because the Pond waters seep directly into the navigable Russian River."  <u>River Watch I</u>, 457 F.3d at 1025; <u>see also</u> <u>S.F. Baykeeper v. Cargill Salt Div.</u>, 481 F.3d 700, 707 (9th Cir. 2007) (stating that Justice Kennedy's <u>Rapanos</u> concurrence is "controlling").

Subsequently, in August 2007, the Ninth Circuit withdrew <u>River Watch I</u> and substituted an opinion that contained some additional explanation as to why Justice Kennedy's <u>Rapanos</u> test was "controlling . . . for [the <u>River Watch</u>] case" as well as for "almost all cases."  <u>River Watch II</u>, 496 F.3d at 999-1000.

(U.S. Oct. 1, 2007) (No. 06-1331). The First Circuit, on the other hand, concluded that because the dissenting Rapanos Justices would find jurisdiction under either Justice Scalia's plurality test or Justice Kennedy's "significant nexus" test, "'the United States may elect to prove jurisdiction under either test.'" United States v. Johnson, 467 F.3d 56, 64 (1st Cir. 2006) (citation omitted), cert. denied, __ U.S. __, __ S. Ct. __, 76 U.S.L.W. 3186 (U.S. Oct. 9, 2007) (No. 07-9). Because the Ninth Circuit in River Watch II expressly adopted the Seventh Circuit's reasoning in Gerke, we review Gerke in detail, and then Johnson.

In Gerke, the Seventh Circuit, faced with a Supreme Court remand "in light of Rapanos," addressed which Rapanos opinion governed the further stages of the case before it. Gerke, 464 F.3d at 724-25. Citing Marks v. United States, 430 U.S. 188, 97 S. Ct. 990 (1977), the Seventh Circuit first noted that when a majority of the Supreme Court agrees only on the result of a case, lower courts "are to follow the narrowest ground to which a majority of the Justices would have assented if forced to choose." Gerke, 464 F.3d at 724. The Gerke court explained that it found Justice Kennedy's test to be "narrower (so far as reining in federal authority is concerned) . . . in most cases, though not in all . . . ." Id. at 724-25.

In support, the Gerke court noted that "[t]he plurality Justices [also] thought that Justice Kennedy's ground for reversing was narrower than their own, because

23

they concluded their extensive and in places harsh criticism of the concurrence by saying that 'Justice Kennedy tips a wink at the agency [i.e., the Corps of Engineers], inviting it to try its same expansive reading again.'" Id. at 724 (quoting Rapanos, __ U.S. at __ n.15, 126 S. Ct. at 2234 n.15 (plurality opinion)). In that regard, the Gerke court observed that Justice Kennedy's concurrence "expressly rejected two 'limitations' imposed by the plurality on federal authority over wetlands" under the CWA. Id. (citation omitted).

The Gerke court surmised that in some wetlands cases Justice Kennedy would vote against finding CWA jurisdiction due to the lack of a "significant nexus," even when the plurality and the dissenting Justices would vote for CWA jurisdiction due to a "surface-water connection" between "wetlands (however remote)" and "a continuously flowing stream (however small)." Id. at 725 (quotation marks and citation omitted). However, the Gerke court dismissed such instances as "rare" and concluded that, "as a practical matter," Justice Kennedy's concurrence provides "the least common denominator." Id.

In contrast, the First Circuit in Johnson determined that it would uphold CWA jurisdiction in those cases in which either Justice Scalia's test or Justice Kennedy's test was satisfied. Johnson, 467 F.3d at 64-65. Since—per Justice Stevens's dissent—the four dissenting Justices in Rapanos would vote to uphold

24

CWA jurisdiction whenever either of the two tests were met, the First Circuit reasoned that the "simple and pragmatic" way to determine the governing standard was to find CWA jurisdiction in either situation.  Id. at 64.

The First Circuit acknowledged Marks's language that the holding of a fractured decision "is the position of the Justices 'who concurred in the judgments on the narrowest grounds . . . .'" Id. at 65 (quoting Marks, 430 U.S. at 193, 97 S. Ct. at 993).  The First Circuit nevertheless cited various post-Marks cases in which, in the First Circuit's view, the Supreme Court itself had examined not only plurality and concurring opinions, but also dissenting opinions, in order to determine the holding of an earlier, fragmented Supreme Court decision.  See id. at 65-66.  The First Circuit concluded that its approach was therefore "particularly sound given that the Supreme Court itself has moved away from [rigid application of] the Marks formula."  Id. at 65.[13]

For the reasons stated below, we join the Seventh and the Ninth Circuits' conclusion that Justice Kennedy's "significant nexus" test provides the governing rule of Rapanos.

---

[13]According to the First Circuit, "'Marks is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions.'" Johnson, 467 F.3d at 63-64 (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)).  In the First Circuit's view, the "shortcomings of the Marks formulation in applying Rapanos" were actually highlighted by Gerke, in which the Seventh Circuit observed that there would be some cases in which the plurality's test would be satisfied, but Justice Kennedy's test would not, and vice-versa.  Id. at 64.

Marks expressly directs lower courts, including this Court, that "[w]hen a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding . . . may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks, 430 U.S. at 193, 97 S. Ct. at 993 (emphasis added) (quotation marks and citation omitted); see also United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1136 n.6 (11th Cir.), cert. denied, __ U.S. __, 127 S. Ct. 146 (2006). The "narrowest grounds" is understood as the "less far-reaching" common ground. Johnson v. Bd. of Regents, 263 F.3d 1234, 1247 (11th Cir. 2001). We simply cannot avoid the command of Marks.

We are controlled by the decisions of the Supreme Court. Dissenters, by definition, have not joined the Court's decision. In our view, Marks does not direct lower courts interpreting fractured Supreme Court decisions to consider the positions of those who dissented. See King v. Palmer, 950 F.2d 771, 783 (D.C. Cir. 1991) (en banc) ("[W]e do not think we are free to combine a dissent with a concurrence to form a Marks majority."). Marks talks about those who "concurred in the judgment[]," not those who did not join the judgment. Marks, 430 U.S. at 193, 97 S. Ct. at 993. It would be inconsistent with Marks to allow the dissenting Rapanos Justices to carry the day and impose an "either/or" test, whereby CWA

26

jurisdiction would exist when either Justice Scalia's test or Justice Kennedy's test is satisfied. See Rapanos, __ U.S. at __, 126 S. Ct. at 2265 (Stevens, J., dissenting). The fact that the dissenting Justices would uphold CWA jurisdiction under both Justice Scalia's test and Justice Kennedy's test is of no moment under Marks. Further, when the Supreme Court's Justices are interpreting their own prior opinions, they can always reconsider them and thus may look more broadly to the rationale in a dissent. We do not have that luxury.[14]

Thus, pursuant to Marks, we are left to determine which of the positions taken by the Rapanos Justices concurring in the judgment is the "narrowest," i.e., the least "far-reaching." See Marks, 430 U.S. at 193, 97 S. Ct. at 993; Bd. of Regents, 263 F.3d at 1247. The issue becomes whether the definition of "navigable waters" in the plurality or concurring opinions in Rapanos was less far-reaching (i.e., less-restrictive of CWA jurisdiction). See Gerke, 464 F.3d at 724-25.

Notably, Justice Kennedy's test, at least in wetlands cases such as Rapanos, will classify a water as "navigable" more frequently than Justice Scalia's test. See Gerke, 464 F.3d at 724-25; Rapanos, __ U.S. at __ n.14, 126 S. Ct. at 2265 n.14 (Stevens, J., dissenting); see also Johnson, 467 F.3d at 64. This is because Justice

---

[14]The First Circuit's Johnson decision is nevertheless correct on this point: Marks does not "translate easily" to Rapanos. Johnson, 467 F.3d at 64.

27

Kennedy's concurrence rejected two "limitations" imposed by the plurality's test on the definition of "navigable waters." Rapanos, __ U.S. at __, 126 S. Ct. at 2242 (Kennedy, J., concurring). Specifically, Justice Kennedy's concurrence rejected the plurality's requirement that "navigable waters" must be "relatively permanent, standing or flowing bodies of water," and also rejected the plurality's requirement of a "continuous surface connection." Id. at __, 126 S. Ct. at 2242-44 (quotation marks and citations omitted). As discussed later, in factual circumstances different from Rapanos, Justice Scalia's test may be less restrictive of CWA jurisdiction; however, in determining the governing holding in Rapanos, we cannot disconnect the facts in the case from the various opinions and determine which opinion is narrower in the abstract. Thus, pursuant to Marks, we adopt Justice Kennedy's "significant nexus" test as the governing definition of "navigable waters" under Rapanos. See Gerke, 464 F.3d at 725; River Watch II, 496 F.3d at 999-1000.

D.     **The jury instruction was erroneous and not harmless error**

We next consider whether the district court's jury charge comported with Justice Kennedy's "significant nexus" test.[15]

Again, under Justice Kennedy's concurrence, a water can be considered

---

[15]The government tacitly concedes that the jury charge did not meet Justice Kennedy's "significant nexus" test. See Resp. Br. of United States at 24-25 ("The defendants correctly point out that the[] instructions do not precisely meet . . . . Justice Kennedy's standard . . . .").

"navigable" under the CWA only if it possesses a "significant nexus" to waters that "are or were navigable in fact or that could reasonably be so made." Rapanos, __ U.S. at __, 126 S. Ct. at 2236 (Kennedy, J., concurring). Moreover, a "mere hydrologic connection" will not necessarily be enough to satisfy the "significant nexus" test. Id. at __, 126 S. Ct. at 2250-51. The district court here did not mention the phrase "significant nexus" in its "navigable waters" instruction to the jury or advise the jury to consider the chemical, physical, or biological effect of Avondale Creek on the Black Warrior River. Rather, the district court instructed the jury that a continuous or intermittent flow into a navigable-in-fact body of water would be sufficient to bring Avondale Creek within the reach of the CWA. As such, the instruction did not satisfy Justice Kennedy's "significant nexus" test and was erroneous.

Moreover, the government bears the burden of establishing that the jury charge error was harmless. See Neder v. United States, 527 U.S. 1, 15, 119 S. Ct. 1827, 1837 (1999) (concluding that "the omission of an element [from a jury instruction] is an error that is subject to harmless-error analysis"); United States v. Olano, 507 U.S. 725, 734-35, 113 S. Ct. 1770, 1778 (1993) (when a defendant has made a timely objection and harmless-error review applies, the government has the burden of establishing that any error was harmless); United States v. Mathenia, 409

29

F.3d 1289, 1291-92 (11th Cir. 2005) (same).

In order to carry its burden, the government must establish that the error did not "affect [defendants'] substantial rights." Fed. R. Crim. P. 52(a). We have explained that in the case of non-constitutional error,[16] the government can meet this burden by showing that the error "did not affect the verdict, 'or had but very slight effect.'" United States v. Hornaday, 392 F.3d 1306, 1315 (11th Cir. 2004) (quoting Kotteakos v. United States, 328 U.S. 750, 764, 66 S. Ct. 1239, 1248 (1946)). If the government can establish "'with fair assurance . . . that the judgment was not substantially swayed by the error,' the judgment is due to be affirmed even though there was error." Id. at 1315-16 (quoting Kotteakos, 328 U.S. at 764, 66 S. Ct. at 1248). Nevertheless, "[t]he non-constitutional harmless error standard is not easy for the government to meet. It is as difficult for the government to meet that standard as it is for a defendant to meet the third-prong prejudice standard for plain error review." Mathenia, 409 F.3d at 1292.

Here, the government failed to satisfy its burden. Although Wagoner (the EPA investigator) testified that in his opinion there is a continuous uninterrupted flow between Avondale Creek and the Black Warrior River, he did not testify as to

_____

[16]We need not reach the question of whether the Rapanos error in this case was constitutional or non-constitutional, because, as explained momentarily, we conclude that the Rapanos error here was not harmless even under the less demanding harmless-error test for non-constitutional error.

any "significant nexus" between Avondale Creek and the Black Warrior River. The government did not present any evidence, through Wagoner or otherwise, about the possible chemical, physical, or biological effect that Avondale Creek may have on the Black Warrior River, and there was also no evidence presented of any actual harm suffered by the Black Warrior River.[17] Thus, the government failed to establish that the jury instruction error did not affect the jury's verdict or had but very slight effect, and the district court's "navigable waters" instruction was not harmless error.[18]

We recognize that the government, attempting to show harmless error, stresses that it presented evidence of a continuous flow between Avondale Creek (a relatively permanent, fixed body of water) and the Black Warrior River (a navigable-in-fact water), and argues that this evidence satisfies Justice Scalia's test. The government also emphasizes that even the Seventh Circuit in Gerke noted that

---

[17]We further note that prior to trial, the district court denied defendants' motion to dismiss the indictment and indicated that it would apply a broad, Eidson-based definition of "navigable waters" under which the government would not need to prove that pollutants actually reached a navigable body of water. Defendants thus arguably had no incentive to put on evidence of any lack of "significant nexus" between Avondale Creek and the Black Warrior River. See, e.g., O'Connor v. Ohio, 385 U.S. 92, 93, 87 S. Ct. 252, 253 (1966) (declining to penalize criminal defendant for failing to anticipate a new rule of law announced after the defendant's trial).

[18]Because Avondale Creek is not adjacent to the Black Warrior River, but separated by Village Creek, Bayview Lake, and Locust Fork, there is no claim in this case that the "significant nexus" test could be met by the adjacency of Avondale Creek and the Black Warrior River. See supra note 11.

31

there may be some cases in which Justice Kennedy would find no CWA jurisdiction, but Justice Scalia and the dissenting Justices would, and that as a practical matter (i.e., counting the Rapanos votes), defendants' convictions should be affirmed under Justice Scalia's test.

This case arguably is one in which Justice Scalia's test may actually be more likely to result in CWA jurisdiction than Justice Kennedy's test, despite the fact that Justice Kennedy's test, as applied in Rapanos, would treat more waters as within the scope of the CWA. See Gerke, 464 F.3d at 725 (recognizing the potential for such cases but classifying them as "rare"). To be sure, the district court's jury instruction was still erroneous even under Justice Scalia's plurality opinion, because the instruction allowed the jury to find that defendants' discharges were into a "navigable water" even if the jury also concluded that Avondale Creek flowed "only intermittently."[19] But under Justice Scalia's test, that error may well have been harmless, because Wagoner, the EPA investigator, clearly and unambiguously testified that there is a continuous, uninterrupted flow between Avondale Creek and the Black Warrior River. Under Justice Scalia's test, the district court's jury instruction error arguably "did not affect the verdict, 'or

---

[19]Under Justice Scalia's plurality opinion, a "navigable water" only includes relatively permanent, standing, or continuously flowing "fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows." Rapanos, __ U.S. at __, 126 S. Ct. at 2221-22, 2225.

had but very slight effect.'" Hornaday, 392 F.3d at 1315 (citation omitted). Thus, the decision as to which Rapanos test applies may be outcome-determinative in this case, and so it is not surprising that the government advocates a practical, Johnson-style approach whereby all votes—from plurality, concurring, and dissenting Justices—are counted.[20]

Nevertheless, as we have already discussed, Marks requires us to adopt the narrowest view of the Justices who concurred in the judgment in Rapanos. Thus, Justice Kennedy's test is the test against which we have measured the district court's jury instruction for harmless error. Justice Kennedy's test is also the test that the district court must apply on remand, for the reasons explained.[21]

## E.    Other CWA arguments

Defendants raise several other arguments related to their CWA convictions, all of which lack merit.

---

[20]We also need not, and do not, determine whether the government in fact established harmless error under Justice Scalia's plurality opinion in Rapanos, because, as discussed, it would be inconsistent with Marks for us to follow and apply Justice Scalia's opinion. Indeed, defendants point out that Wagoner admitted on cross-examination, inter alia, that he did not conduct any "tracer tests" to verify continuous flow between Avondale Creek and the Black Warrior River; that he conducted no tests to measure the volume of discharge from Avondale Creek or between the bodies of water connecting Avondale Creek and the Black Warrior River; and that the water level of Avondale Creek was low enough that he was able to walk its length. Furthermore, defendants had no incentive to present evidence regarding a lack of continuous flow, because the district court clarified prior to trial that its definition of "navigable waters" would include waters with either continuous or intermittent flow. See also supra note 17.

[21]We express no opinion as to whether Avondale Creek does or does not actually satisfy Justice Kennedy's test; that is a question for the jury in the first instance.

First, all defendants contend that the district court's "navigable waters" error, discussed supra, entitles them to judgments of acquittal, and not merely new trials, because there was insufficient evidence that defendants discharged any process wastewater into a Rapanos-defined "navigable water."[22]

Preliminarily, we observe that on appeal, defendants do not contend that there was insufficient evidence that their discharges were into a "navigable water" as that term was incorrectly defined for the jury by the district court in the actual trial. Indeed, the government presented sufficient evidence that defendants' discharges were into a "navigable water" as the term was incorrectly defined by the district court, and so acquittal is not warranted on that ground.

Rather, defendants' contention is that they are entitled to judgments of acquittal based on the district court's Rapanos error. This argument, however, ignores our precedent stating that "[r]emand for a new trial is the appropriate remedy where . . . [any] insufficiency of evidence is accompanied by trial court error whose effect may have been to deprive the Government of an opportunity or incentive to present evidence that might have supplied the deficiency." United States v. Sanchez-Corcino, 85 F.3d 549, 554 n.4 (11th Cir. 1996), overruled on

---

[22]We review the sufficiency of the evidence de novo, drawing all reasonable inferences in favor of the government. United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005), cert. denied, 547 U.S. 1047, 126 S. Ct. 1635 (2006).

other grounds by <u>Bryan v. United States</u>, 524 U.S. 184, 118 S. Ct. 1939 (1998).

Here, we need not evaluate whether there was insufficient evidence that

defendants' discharges were into "navigable waters" as that term is properly

defined under <u>Rapanos</u>. Instead, it is enough to note that the district court

erroneously defined "navigable water" and made it clear to the parties far in

advance of trial that it would continue to use its erroneous definition throughout

the case. That decision deprived the government of any incentive to present

evidence that might have cured any resulting insufficiency or met Justice

Kennedy's "significant nexus" test.[23] Thus, under <u>Sanchez-Corcino</u>, we conclude

that remand for a new trial is the appropriate remedy in this case.

Second, all defendants contend that there was insufficient evidence that any

discharges of process wastewater occurred in specific months, as charged in the

indictment, entitling defendants to a judgment of acquittal. However, defendants

concede that the government put forth sufficient evidence that five of the charged

CWA violations (Counts 2, 14, 16, 21, and 22) occurred as charged in the

indictment. Moreover, Harbin testified that between May 1999 and January 2001,

process wastewater was discharged into storm drains at least fifteen out of twenty

operating days per month, and several former employees testified that pumping

---

[23]<u>See also</u> <u>supra</u> note 17.

35

regularly occurred on Friday nights.

Third, Delk and McWane argue that there was insufficient evidence that they participated in a CWA conspiracy, and Delk further argues that there was insufficient evidence that he discharged any process wastewater or caused anyone else to discharge wastewater in violation of the CWA. We disagree. For example, Delk was one of two McWane employees designated as having responsibility for McWane's NPDES compliance, and witnesses testified that Delk gave orders to discharge process wastewater and once directed Harbin to falsify a water sample so that McWane could pass an inspection.

Fourth, we reject Delk's and Devine's argument that they were deprived of their due process rights to a fair trial when the district court struck three of the four objects of the CWA conspiracy from the indictment at the close of the government's case.[24] Delk and Devine primarily rely on United States v. Adkinson, 135 F.3d 1363 (11th Cir. 1998); however, that case is materially distinguishable. In Adkinson, four of the five objects of the conspiracy in the indictment did not state an offense under prevailing law, and the government presented evidence as to those four objects that was not relevant to the fifth object.

_____

[24]Denials of motions to dismiss the indictment are reviewed for abuse of discretion, see United States v. Waldon, 363 F.3d 1103, 1108 (11th Cir. 2004), but underlying legal errors, including due process claims, are reviewed de novo, see Agan v. Vaughn, 119 F.3d 1538, 1541 (11th Cir. 1997).

36

Adkinson, 135 F.3d at 1372. The district court in Adkinson only permitted the government to present such evidence because the government assured the district court that the prevailing law would change before the end of the trial; however, the expected change in the law did not occur in time. Id. at 1369-70. The district court in Adkinson then struck the four legally impermissible objects of the conspiracy after the trial, but at that point, the district court had allowed into evidence "[m]ountains of details relevant only tangentially, if at all, to the ultimately charged scheme." Id. at 1372. As this Court observed on appeal in Adkinson, the district court thus "obviously invited the jury to convict for conduct not, ultimately, even alleged to be a crime." Id. (emphasis added).

In contrast, the four objects of the CWA conspiracy in this case were legally proper under prevailing law, and the district court simply determined that the evidence did not support the objects that were ultimately struck. Cf. Adkinson, 135 F.3d at 1373 n.30 (noting that Adkinson was "not a case where perfectly proper charges [were] ultimately found by the court not to be supported by the evidence at trial"). Moreover, the district court stated that substantially all of the evidence relating to the stricken objects of the conspiracy also related to the CWA discharges, and defendants have failed to establish that the district court abused its

37

discretion in that evidentiary ruling.[25]

Finally, we recognize that Devine argues that the government had to prove that Devine knew the terms of McWane's NPDES permit and knowingly violated the permit. We need not determine whether the district court should have required the government to establish that Devine knew the terms of McWane's NPDES permit. Any such error committed by the district court in this regard was harmless, because there was ample evidence presented that Devine did in fact know the terms of McWane's NPDES permit.

## F. False statement in Count 24

McWane's last argument is that it is entitled to acquittal on Count 24, the false statement count. Under 18 U.S.C. § 1001, a conviction for making a false statement in a matter within the jurisdiction of the executive branch of the United States requires proof of five elements: "(1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction." United States v. Herring, 916 F.2d 1543, 1546 (11th Cir. 1990).

Count 24 against McWane concerns certifications that Robison signed on McWane's behalf and that McWane submitted to the EPA. There is no dispute

---

[25]Evidentiary rulings are reviewed for an abuse of discretion. See United States v. Henderson, 409 F.3d 1293, 1297 (11th Cir. 2005), cert. denied, 546 U.S. 1169, 126 S. Ct. 1331 (2006).

that the statements in the certifications were material. Rather, McWane contends that the government presented insufficient evidence to satisfy elements two (falsity) and four (specific intent). Specifically, McWane contends that what Robison represented in the certifications was not false and that the government presented no evidence that Robison's certifications—as opposed to the underlying plant inspection reports prepared by other persons and submitted with the certifications—were false.

We first review the allegations in Count 24 and then explain why the record supports McWane's argument for several reasons.

First, the language of the certifications, introduced into evidence at trial, is materially different from the charge in Count 24, and thus the certifications themselves do not support that charge. Count 24 charged McWane and Robison with making a false statement to the EPA, in violation of § 1001, as follows:

> MCWANE, INC. and CHARLES "BARRY" ROBISON, the defendants, in a matter within the jurisdiction of [the EPA] . . . did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation that is, the defendants certified that documents submitted on or about August 17, 2000 and September 15, 2000, to EPA pursuant to a request under the [CWA] . . . , including "Daily . . . and Monthly . . . Inspection[]" forms, were "true, accurate, and complete," when in truth and fact, as defendants MCWANE and CHARLES "BARRY" ROBISON then well knew and believed, certain "Daily . . . and Monthly . . . Inspection" forms included in the submission to EPA were false.

39

In sum, Count 24 alleged that McWane and Robison's certifications falsely represented that the plant inspection reports submitted to the EPA "were 'true, accurate, and complete,' when in truth and fact," McWane and Robison well knew that certain of the submitted documents—plant inspection reports for January 1998 through March 2000—were false.[26]

However, McWane correctly points out that Robison, on McWane's behalf, did not certify that he personally knew that the attached documents—i.e., the plant inspection reports—were accurate, or even that he had personally reviewed the inspection reports. Rather, Robison certified only that the documents were prepared under his direction or supervision in accordance with a system designed to ensure that qualified personnel would properly gather and evaluate the documents, and that based on his inquiry of those persons who were responsible for gathering the documents, to the best of his knowledge, the documents were accurate. Specifically, the certifications in evidence, which Robison signed, state in full:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision, in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly

---

[26]We note that prior to trial, the scope of Count 24 was narrowed to encompass only the September 15, 2000 submission.

40

> responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

In other words, Robison certified that other qualified persons had prepared the documents and advised him of the documents' accuracy. Because of the language in the certifications, Robison could truthfully make the representations included in the certifications even if the underlying documents included with the submissions were false.

Second, the government introduced no evidence that the plant inspection reports were prepared or gathered in a manner or a system other than that certified to by Robison. The government also presented no evidence that Robison did not inquire of the persons responsible for gathering the documents, as Robison represented in the certifications. And the government presented no evidence that upon inquiring of such persons, Robison learned from such persons that the documents were not true or accurate. Indeed, the government acknowledged before the district court that it presented no evidence as to McWane's document-gathering "system" or Robison's "inquiries" of the persons responsible for gathering the documents. Thus, the government failed to prove that any of the statements actually certified to by Robison were false.

41

Third and most notably, McWane points out that the EPA previously required a certifying individual to certify that he or she had "personally examined" documents included in submissions, such as the one at issue here, but in 1983, the EPA eliminated the "personal examination" requirement. Compare 40 C.F.R. § 122.6(d) (1981) (requiring EPA certifications to state that "under penalty of law . . . I have personally examined and am familiar with the information submitted in this document and all attachments"), with 48 Fed. Reg. 39,611, 39,613 (Sept. 1, 1983) (eliminating the personal examination requirement). As such, the certifications in this case contained no representation that Robison had personally reviewed the documents in question or that he was vouching for the documents' accuracy based on his personal knowledge of the documents themselves. Rather, Robison only certified—and only had to certify—that others had prepared the documents, and that based on his inquiry of those who prepared the documents, the documents were accurate to the best of his knowledge.

The government responds that, notwithstanding the actual language of the certifications, Robison had personal knowledge of the problems at the plant, the plant inspection reports showed no problems at the plant, and therefore, Robison falsely certified that the inspection reports were accurate. Even assuming without deciding that such offense conduct is adequately encompassed in Count 24, the

42

government still presented no evidence that Robison ever personally reviewed the plant inspection reports or had personal knowledge of the contents of the plant inspection reports, which is needed to show that his certifications about the reports were false.

Certainly, the government introduced evidence that some of the plant inspection reports themselves were false. Indeed, Walsh (McWane's former safety and personnel director) testified that he was the employee who prepared the inspection reports at issue and that some of them were false. However, Walsh made clear that Robison was not among the several McWane employees who received copies of the inspection reports in the regular course of McWane's business.[27] Additionally, there were approximately 600 pages of documents attached to the certifications, and those documents included more than just the falsified inspection reports that accompanied the certifications at issue here.[28] The

[27]We stress that the government does not argue that McWane violated § 1001 by submitting false inspection reports to the EPA. Rather, the government concedes that under Count 24, it had to prove that the certifications themselves contained false statements. In other words, the government acknowledges that the false statements in the inspection reports, in and of themselves, are insufficient to sustain McWane's false statement conviction. Thus we necessarily focus on the language in the certifications.

[28]Chetan Gala, an EPA enforcement officer, testified that the post-inspection documents that McWane was required to produce (and that accompanied the certifications at issue in this case) included: (1) information about McWane's CWA permit for the plant; (2) information about entities that provided laboratory services to McWane; (3) McWane's discharge monitoring reports for a five-year period; (4) a diagram of McWane's plant; (5) McWane's "Best Management Practices Plan," "Storm Water Pollution Prevention Plan," and "Spill Prevention Control and Countermeasure Plan," as well as the inspection reports, training records, and

43

problem with the government's conclusory argument—that the evidence showed that Robison knew the inspection reports he submitted were false—is that Count 24 is a specific intent crime, and the government cannot point to any evidence that Robison <u>actually knew</u> the contents of the particular <u>inspection reports</u> accompanying the certifications or that Robison <u>actually knew</u> that those particular <u>inspection reports</u> contained false information.[29]

The government thus failed to establish that Robison's certified statements were knowingly false. At most, the government proved that Robison negligently submitted documents to the EPA, but that is insufficient. <u>See</u> <u>United States v. Baker</u>, 626 F.2d 512, 515-16 (5th Cir. 1980)[30] (stating that "in order to sustain a § 1001 conviction the government must prove that the defendant knowingly made a false statement with intent to deceive," and further stating that the specific intent requirement of § 1001 excludes "false statements made by inadvertence, mistake, [or] carelessness") (quotation marks omitted).

---

corrective action reports accompanying those plans; (6) the location where McWane's records were stored; (7) a schematic of the production process and related documents; (8) a description of the waste disposal system; and (9) CWA-related inspection reports by ADEM and related correspondence for a five-year period.

[29]Even Robison's contemporaneous notes fail to help the government, because the notes do not refer to any inspection reports and are not evidence that Robison had reviewed the contents of the particular inspection reports submitted to the EPA.

[30]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (<u>en banc</u>), this Court adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.

44

Accordingly, we must conclude that McWane is entitled to a judgment of acquittal on Count 24.

## III. CONCLUSION

For the foregoing reasons, defendants' convictions are reversed. The case is remanded for entry of a judgment of acquittal in favor of defendant McWane on the false statement count (Count 24). The case is remanded for a new trial as to all defendants on the CWA conspiracy count (Count 1) and for a new trial as to all defendants charged in the remaining substantive CWA counts (Counts 2, 3, 5, 7-19, 21, and 22).

**REVERSED, VACATED, and REMANDED.**